231 N.J. Super. 365 (1989)
555 A.2d 722
IN THE MATTER OF THE TENURE HEARING OF RICHARD WOLF, SCHOOL DISTRICT OF THE BOROUGH OF NATIONAL PARK, GLOUCESTER COUNTY.
Superior Court of New Jersey, Appellate Division.
Argued February 7, 1989.
Decided March 14, 1989.
*367 Before Judges ANTELL, DREIER and BROCHIN.
Steven R. Cohen argued the cause for petitioner (Selikoff & Cohen, attorneys; Steven R. Cohen, of counsel and on the brief).
Joseph F. Betley argued the cause for the National Park Board of Education (Capehart & Scatchard, attorneys; Alan R. Schmoll, of counsel; Joseph F. Betley, on the brief).
Diane M. Verlangieri, Deputy Attorney General argued the cause for the State Board of Education (Donald R. Belsole, Acting Attorney General, attorney; Diane M. Verlangieri, on the statement).
The opinion of the court was delivered by DREIER, J.A.D.
Petitioner, Richard Wolf, appeals from a decision of the State Board of Education dismissing him from his position as a tenured fifth grade teacher in the National Park Elementary School. Wolf had been charged by the Board with "unbecoming conduct," a violation of N.J.S.A. 18A:6-11, in response to complaints by some of his male and female fifth grade students that he had been "feeling the backs of girls to see if they were wearing bras" and "at times touching the buttocks of girls." He denied the charges. After a hearing in the Office of Administrative Law, the Administrative Law Judge (ALJ) issued her initial decision, and recommended that Wolf be "removed from his position." The Commissioner of Education *368 affirmed that decision,[1] and the State Board adopted the Commissioner's decision without further opinion.
Prior to the hearing of the student witnesses before the ALJ, petitioner was summarily excluded from the courtroom, but was provided with a closed-circuit television hookup by which he could view and hear the proceedings. He did not, however, have any method of conferring with his attorney, who remained in the courtroom. If the attorney wished to speak to petitioner, the proceedings had to be halted and counsel had to leave the room for such a conference. As we have found this exclusion of petitioner to have been unwarranted upon the findings of the ALJ, and the procedural safeguards to petitioner's rights inadequate, we are reversing and remanding the matter for a new hearing. We have, however, reviewed the facts in detail to show the prejudicial effect of this procedural determination.
Petitioner had been a teacher with the National Park Board of Education since September 1, 1969. His record prior to the events alleged in these proceedings was unblemished.
On May 28, 1986, National Park Elementary School Principal Raymond Bider received two letters, one anonymous and another signed "by a few girls," complaining of "some name-calling" that Wolf did in class. Bider discussed the matter with the Superintendent of Schools and then with Wolf. The next day Wolf and Bider agreed that Wolf could "handle the matter" by speaking to the children at the end of the day. That night at a school concert Bider talked with one of the girls, A.E., who told him that Wolf had "yelled" at the students. This complaint developed into a third charge against Wolf, which the ALJ dismissed.
On June 3rd, A.E. told another teacher, Susan Slawter, that Wolf "is touching me and I don't like it. I want him to stop ... *369 he touches my back. He feels to see if I'm wearing a bra." On June 4th, several more children spoke to another teacher, Cathleen Allison, about "some things in Wolf's classes." Those "things" included complaints from the children that Wolf brought in subscription-order forms from Playboy (this claim was determined to be unfounded); looked up the girls' dresses;[2] allowed the classes to watch too much television and too many videos (this claim was not pursued); called students "dumbo ears," "big mouth," and "fat slob;" unfastened one girl's bra; snapped the bra straps of several girls; and spanked another.[3]
Allison spoke to Bider, and at Bider's request the children wrote down their complaints. Bider notified the Superintendent of Schools, who requested that Allison and Slawter write down what they knew of the children's complaints. The children, through Allison, requested a meeting with Bider, which was held June 6th. All 45 of the fifth-grade students at school on June 6th attended the meeting, as did Susan Slawter, the school nurse, two other teachers, and Allison and Bider.
The Superintendent met with Allison, Slawter and the principal, and then called the Division of Youth and Family Services (DYFS). Despite his protests that the allegations were untrue, Wolf was suspended with pay, effective June 10th, while DYFS investigated the matter. After receiving DYFS's report in August, the local Board charged Wolf with improperly touching *370 the buttocks and backs of female students, exhibiting a pattern of ridiculing his students, and threatening students for reporting his conduct. After nine days of testimony, the ALJ found that the last charge was unproven, but that the other two had been proven, and they were enough to constitute "conduct unbecoming a teaching staff member." She wrote that "[i]n light of the Commissioner's strong position against improper touching as expressed in [the] McClelland case [discussed infra], I believe I have no alternative" but to recommend dismissal.
This Court's scope of review in such a case is to determine whether the findings made by the ALJ, Commissioner and State Board could "reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." In re Tenure Hearing of Grossman, 127 N.J. Super. 13, 22-23 (App.Div. 1974), certif. den. 65 N.J. 292 (1974), citing Close v. Kordulak Bros., 44 N.J. 589, 598-599 (1965). The record in this case consists of the findings by the Administrative Law Judge and the Commissioner of Education.[4]
As the ALJ noted in her initial decision, "[c]redibility is the central issue in this case." Only one adult saw any of the acts complained of (snapping a girl's bra strap), and she did not report it until these charges were pending, two years after seeing the incident. That of necessity makes children the primary witnesses to the acts now in question. Children's testimony, in the circumstances where it is in conflict with their prior statements "must be used with great caution ... particularly where, as here, such use requires a final adjudication grounded primarily on the basis of the testimony." In re *371 Tenure Hearing of Anthony Polito, 1974 S.L.D. 666, 676. Such credibility considerations are especially necessary in this case, as Wolf's primary defense is that some of the children lied in retaliation for poor grades or because they had personality conflicts with Wolf (A.E., E.D. and T.O. testified that they did not like Wolf for these reasons). Wolf also claimed that his colleagues, Allison and her close friend Slawter, encouraged the children because Slawter had, in her words, "negative feelings" for Wolf, and Allison admittedly "intensely disliked" and "hated" Wolf.
The ALJ wrote that not only were there inconsistencies "between prior statements and [the] testimony" of the children, those inconsistencies "had several sources." The prior statements, wrote the ALJ, were not made under "controlled conditions," and resulted in "hearsay" and "a little embellishment." The ALJ noted specifically that one student, L.T., "admitted that she had invented some prior statements regarding the incidents complained of."[5] However, the ALJ concluded the subject by stating "I do not feel that use of the prior statements is helpful in testing credibility," because "[i]nconsistencies are common to all people...." By disregarding the prior statements of the children, whose testimony under the circumstances should have been treated with "great caution," the ALJ disregarded one of the most valued tools of litigation available to petitioner, the use of prior inconsistent statements to discredit witnesses.[6]
*372 The ALJ added that she did "not believe any of these children deliberately lied, but some of the facts they related were not true." The ALJ then attempted to explain the children's inconsistent and sometimes admittedly false statements.[7] Such attenuated attempts to explain discrepancies in the children's testimony cause us at least to question the final conclusions reached,[8] especially under the procedural circumstances of the *373 children's examination, namely petitioner's inability to guide his attorney in the examination of these creative witnesses.
The ALJ concluded that "all of Wolf's touching of the girls was without prurient or lascivious intent." The Commissioner, after reviewing the entire record, including the transcripts and the video tapes of the hearings before the ALJ, questioned this finding without, however, making a contrary determination. The Commissioner's conclusions, however, were based upon his review of a record which we find procedurally deficient to an extent requiring reversal and retrial.
In challenging the ALJ's determination, petitioner argued in his brief that the ALJ's mind-set was "outcome-determinative," as shown by her exclusion of Wolf from the hearing room. Petitioner challenged as "shocking" and "tragic" the factors considered by the ALJ in making her determination to exclude petitioner. Petitioner notes that the ALJ made no preliminary findings that he had engaged in any conduct threatening to the children; instead, she excluded him on "her own biases and prejudices regarding Wolf's appearance." She stated:
He is physically  he has a beard; he has a rather reddish-colored skin; he has dark eyes, very dark eyes, and dark hair. And I found in observing him, I consider his eyes very piercing. And he was sitting directly in front of me and I observed him as he looked at the witnesses. This is no fault of his. I'm not saying he's doing anything wrong. All I'm saying is if I were a child and was put under those circumstances, the feeling of being intensely covered by piercing eyes of that type, I think they could have fear engendered in them by that. That is not his fault. But I wanted to make it very, very clear that he does have a very intense gaze. And in this circumstance, obviously he is not going to appear smiling and joyful about this. I can't expect him to be genial and pleasant about it. And I feel that my observation of that demeanor, it is very important that the children not feel that intensity is focused upon them if we are going to have the best possible conditions for obtaining the truth.
This description of petitioner's physical appearance and intensity is the ALJ's sole reason for excluding him from the hearing room. Yet it is hard for us to fathom how students, who had *374 been in petitioner's class day after day during the school year, would have found his beard, complexion, eyes or hair threatening.
We can reason by analogy from N.J.S.A. 2A:84A-32.4, a statute permitting video testimony for the protection of both (a) an abused minor in a criminal proceeding in which the minor would be a witness, and (b) an abused or neglected child in a proceeding brought under N.J.S.A. 9:6-8.21 et seq. to protect the child. In such cases it is not the defendant who is forced from the courtroom, but rather the child-witness who is permitted to testify on closed-circuit television; but even then, the exclusion is permitted only after the court has made the specific findings required by N.J.S.A. 2A:84A-32.4b.[9] Without these findings, the procedure separating the defendant and the witness has been held, in the criminal context, to violate the Confrontation Clause of the United States Constitution. Coy v. Iowa, 487 U.S. ___, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). The application of Coy to the New Jersey statute in a delinquency setting has been explained in detail by Judge Shebell in State in the Interest of B.F., 230 N.J. Super. 153 (App.Div. 1989).
While it is true that neither the statute nor Coy is directly applicable to the administrative proceeding under review here, the interests of petitioner are no less deserving of protection than the rights of some criminal defendants, juveniles faced with a delinquency adjudication or parents whose custody over their children is in jeopardy. At the hearing before the ALJ, petitioner was in jeopardy not only of losing his tenure, but also of ending a blemish-free 17-year teaching career, without any realistic prospect of being rehired in the teaching profession. Yet while the witnesses against him testified, petitioner was *375 forced to sit in another room and view the proceedings on television, without contact with his attorney, unless the proceedings were halted and the attorney left the room to confer with petitioner. In a case so fraught with credibility determinations, petitioner was unable to tell his attorney on a question-by-question or even word-by-word basis of circumstances where he thought the children might be lying or exaggerating so that they could be more effectively cross-examined.[10] Petitioner also was deprived of having the children face him with their allegations. Unless there was a specific finding of "a substantial likelihood that the witness would suffer severe emotional or mental distress if required to testify in open court," N.J.S.A. 2A:84A-32.4b, petitioner should have had an opportunity to face his accusers.
At the time petitioner was excluded, his attorney stated initially that he disagreed with the closed-circuit television procedure and that he was not waiving any rights to appeal on that basis. He noted specifically that there was no expert proof of the effect upon the children to justify the use of the procedure, and that the court had made unnecessary presumptions. After the judge stated her reasons, quoted earlier, petitioner's attorney again said that the judge was incorrectly applying a presumption that there would be "some kind of trauma or inability for students to testify truthfully with Mr. Wolf present in the room." The judge responded that she made her finding based upon petitioner's demeanor, and that she did not need an expert. The ALJ distinguished the case before her from criminal proceedings and denied petitioner's reiterated request to change her ruling.
*376 The full panoply of protections afforded a criminal defendant are not available in an administrative proceeding. In Re Bufanio, 119 N.J. Super. 302, 304-305 (App.Div. 1972) (a person appearing before an agency need not be apprised of his right to have counsel present); Weston v. State, 60 N.J. 36, 50-51 (1972) (rules of evidence barring hearsay are not to "be regarded as controlling"); Matter of Toth, 175 N.J. Super. 254, 262 (App.Div. 1980) (hearsay may be used in agency's determination of case); Matter of Stowman, 200 N.J. Super. 507, 511 (App.Div. 1985) (it is not necessary, unless required by statute, that witnesses swear to tell the truth in administrative proceedings). And see N.J.S.A. 52:14B-10(a) (Administrative Procedure Act provision stating that "[t]he parties shall not be bound by rules of evidence ... [except] rules of privilege ..."). Yet one who can suffer the loss of his tenured employment should at the very least have the opportunity to confront his accusers, unless a court has made the specific findings required by N.J.S.A. 2A:84A-32.4b, after the presentation of sufficient evidence to warrant such a determination. Furthermore, if petitioner and the witnesses had to be separated by reason of the considerations set forth in the statute, the court should have insured that there was compliance with N.J.S.A. 2A:84A-32.4d, which provides for communication between petitioner and counsel "during the testimony by a separate audio system."
We realize that the proceedings before us were not criminal in nature and therefore, strictly speaking, the Confrontation Clause of the Sixth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, and the N.J. Const. (1947), Art. I, par. 1, are not directly implicated. Cf. State in the Interest of B.F., supra,; State v. Washington, 202 N.J. Super. 187, 191 (App.Div. 1985). And see Coy v. Iowa, supra, 487 U.S. at ___, 108 S.Ct. at 2802, 101 L.Ed.2d at 866. However, the Fourteenth Amendment of the United States Constitution prohibits any state from depriving "any person of life, liberty, or property, without due process of law." While administrative proceedings may differ *377 in procedure from judicial trials, they must "operate fairly and conform with due process principles." Laba v. Newark Bd. of Educ., 23 N.J. 364, 382 (1957); In re Marvin Gastman, 147 N.J. Super. 101, 112 (App.Div. 1977). Petitioner had tenure rights which were subject to being lost in the proceedings. We therefore determine that excluding petitioner from this hearing under the circumstances described earlier was so fundamentally unfair that a new hearing is required.[11] We repeat that we have not made credibility determinations. We have reviewed the testimony only to determine the significance of the procedural *378 error. The ALJ, Commissioner and State Board are free on remand independently to make an evaluation of the credibility of the witnesses and to reach any reasonable decision concerning the disposition of this matter.
As the ALJ who initially heard the case has made credibility findings which might be difficult to disregard after a rehearing, we remand this matter to the Office of Administrative Law for a new hearing to be held before a different judge. We commend the Commissioner for expending the time and effort both to review the transcript and view the video tapes. We trust that when the new recommendations are made by the ALJ, the Commissioner will be able to repeat this process and determine the matter solely on the basis of the rehearing.
The determination of the State Board is reversed and the matter is remanded to the State Board of Education for reference to the Office of Administrative Law for a new hearing.
NOTES
[1] In this order, the Commissioner changed only the date the removal was to be effective from the date of Wolf's suspension by the School Board, as the ALJ had recommended, to the date of the Commissioner's order, July 1, 1987.
[2] This allegation grew out of the odd practice petitioner had developed over the years. Because of a back condition, petitioner would lie down on the floor and encourage the students to do so too. The charge was determined to be unfounded, and we note petitioner had never been instructed to discontinue the practice.
[3] Although some students testified to a single spanking incident, the girl allegedly involved testified unequivocally that the incident had not occurred. The ALJ by extended analysis tried to reconstruct the incident and show how it had been misperceived, and that petitioner had merely stopped the child from running in the classroom and that the girl had by force of the motion fallen over his lap. Petitioner denied that even that had occurred.
[4] The Division of Youth and Family Services did prepare a report, but this report contained statements that one adult and several children who were interviewed later denied making. The ALJ did not discuss this report in reaching her conclusions.
[5] L.T. also had been examined earlier in the school year for "concerns relating to her emotional state," as she complained of "men" following her while she was at home, shopping, or with her friends, and that she heard footsteps of a "man" who opened the gate of her house at night. Her stepfather investigated her concerns, but found no one.
[6] We appreciate that prior to the hearing petitioner had to prepare his case based upon these statements. The ALJ's general disregard of prior statements rendered the exclusion procedure all the more objectionable. The need for immediate access between attorney and client is apparent.
[7] She described, as an example, the testimony of several children who stated that a gift of a hippopotamus candle from Wolf to A.E. was not a candle, but was a hippopotamus poster. (The girl took the gift to be a jibe at her weight; petitioner testified that the candle showed the animal with a wide open mouth, and that it was given as a humorous reminder to A.E. not to talk too much). "Clearly," stated the ALJ,

those who insisted the hippo was on a poster never saw the transfer of the gift, but may had been close enough to the doorway of the classroom to know that it occurred and filled in the missing fact by means of their imagination and limited experience. Perhaps they could only visualize a picture of a hippo being transferred from hand to hand and thus a poster or picture became fixed in their recollection at the time. They were not lying. That was what they recalled. Such an error of recollection does not necessarily vitiate their testimony.
Later in her decision the ALJ stated that A.E.
was credible; her reference to a hippo poster ... led me to believe that there might have been a hippo poster somewhere that the children saw in addition to the hippo-shaped candle. A.E. did not know of a poster, however, so I cannot find that it existed.
There are other similar rationalizations for other misstatements of the children in the record.
[8] We have also reviewed the problem of the ALJ's inconsistent findings. For example, in the ALJ's finding #7 she addressed Wolf's admitted characterizations of children's behavior as "a royal pain" "a pain", "on the borderline," or "OK." She wrote that "[c]hastising students in front of the whole class in this manner was clearly inappropriate." Yet in finding #23, she stated, inter alia, that Wolf's "[c]hastising D.D. for her friendship [with another girl]," in a place "not within full view or hearing of the whole classroom" was evidence of a "pattern of conduct [showing] that Wolf realized that his motivations were not educationally sound." Which was he to do, chastise in front of the class (which the ALJ termed "clearly inappropriate"), or chastise privately (evidence, according to the ALJ, of a pattern of conduct showing educationally unsound motivations)? Although there are other similar examples of inconsistencies, in view of our resolution of the due process point, we will not discuss them in detail. It is sufficient for our purposes here to find that credibility was the central issue in the case, and that these examples showed that any matter strongly affecting petitioner's ability to attack credibility could have affected the result of the entire case.
[9] The statute requires a finding that "the witness would suffer severe emotional or mental distress if required to testify in open court." The order must be "based on specific findings relating to the impact of the presence of" the alleged abuser on each of the child witnesses.
[10] This is especially true where the children were constantly departing from their prior statements which had been supplied to petitioner and his counsel. There thus was a continuing need for immediate contact between attorney and client for background and assessment of the new versions being recounted by the witnesses.
[11] We have not commented directly upon the legal theory under which petitioner was dismissed, i.e., that the touching, even without licentious purpose, and the name calling required dismissal, irrespective of the fact that petitioner had never been warned or counselled concerning this matter. We note, however, that both the ALJ and Commissioner based their decisions in part upon In re Tenure Hearing of George McClelland, 1983 S.L.D. 19, aff'd A-152-83T2 (App.Div. 1984) (unreported). Both the Commissioner and this court in McClelland stressed that the penalty of dismissal was appropriate on the grounds of insubordination, since the petitioner in McClelland had been once warned and later once again specifically directed concerning his practice of stroking and touching female students. We note that in the case before us there were no warnings, nor apparently even a consideration of a penalty less than dismissal after the first reporting of the incidents, whereas in McClelland dismissal was not considered appropriate until charges were brought after the third reporting of the incidents. Cf. In re Tenure Hearing of Ralph M. Thomas, OAL Dkt. No. EDU 1784-88. And see In re Tenure Hearing of William T. Wagner, OAL Dkt. No. EDU 6383-87 (fine of 120 days salary and the loss of a year's salary increment for similar touching); In re Tenure Hearing of Robert Ferenz SB #73-85 (noting dismissal does not automatically follow conduct unbecoming a teacher); In re Fulcomer, 1967 S.L.D. 215 (suspension sufficient notwithstanding the teacher having "improperly and unnecessarily inflicted physical violence" on two occasions); and compare In re Tenure Hearing of Anthony Pasquale, OAL Dkt. No. EDU 6879-83 (dismissal upheld where teacher was found to have sexually assaulted male students on eleven separate occasions) with In re Tenure Hearing of Jude Martin, OAL Dkt. No. EDU 6115-87 (where the Commissioner determined that dismissal was not warranted although the teacher had made a homosexual advance to a young adult, had a serious drinking problem, and had twice been convicted of driving with a revoked driver's license). While the ALJ, Commissioner and State Board are not strictly bound by stare decisis, we trust that if after the rehearing petitioner is again found to have committed specific offenses, they might wish to reconsider the penalty to be imposed in light of their prior decisions.