576 A.2d 261

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–APPELLANT, v. J.B., DEFENDANT–RESPONDENT.

IN THE MATTER OF J.B., A MINOR, APPELLANT.

Argued May 7, 1990—Decided July 5, 1990.

*Joyce L. Maraziti,* Assistant Deputy Public Defender, argued the cause, as Law Guardian, for appellant J.B. (*Wilfredo Caraballo,* Public Defender, attorney).

*Vincent P. Valerio,* Deputy Attorney General, argued the cause for appellant Division of Youth and Family Services (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

*Dennis D. Poane* argued the cause for respondent (*Steinberg, Steele & Poane,* attorneys).

*Richard M. Eittreim* argued the cause on behalf of Asbury Park Press (*McCarter & English,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

The issue on this appeal is whether closure to the public of certain custody cases involving the Division of Youth and Family Services (DYFS or the Division) is mandated by Court Rules or statute. In this emergency-removal procedure instituted by DYFS, the trial court exercised its discretion in favor of admitting the press to the preliminary hearing. We granted the child's law guardian leave to appeal and now affirm.

## I.

### A.

Defendant's wife and infant child died in an automobile collision with a drunk driver. Defendant gained a degree of

publicity through his subsequent efforts to combat drunk driving. Defendant suffers from manic-depressive disorder as well as post-traumatic stress syndrome, conditions for which he receives medical and psychological treatment. According to his doctor, defendant's occasional failure to take regular dosages of the prescription drug lithium sulphate invariably leads to debilitating episodes of mental illness. When so afflicted, defendant has been known to leave his surviving three-year-old son in the care of neighbors or relatives.

In January 1990 an anonymous report alerted DYFS to the possibility that defendant's mental illness was seriously affecting his parenting ability. As a result of the ensuing investigation, DYFS removed defendant's child from his custody without court order, pursuant to *N.J.S.A.* 9:6–8.29. DYFS served defendant with a notice of emergency removal and advised him that an order to show cause and a verified complaint would be presented at a preliminary hearing on the following day. See *N.J.S.A.* 9:6–8.30 and –31. When defendant appeared in court to answer the complaint, he was accompanied by four members of the press who asked for permission to view the proceedings. DYFS opposed opening the proceedings. Defendant argued in favor of admitting the press. After extended argument from all parties, including the child's law guardian, the court ordered that the press would have access to the preliminary hearing.

In its ruling the trial court considered the question of press access based on the "best interests of the child" standard. See *N.J.S.A.* 30:4C–15(c). The court discounted the defendant's desire to have the press report on the proceeding. The court maintained that no *per se* rule could govern, that determinations must be made on a case-by-case basis:

> I know the Division may very well feel sensitive in the sense that these are proceedings that shouldn't of their natural—naturally be opened to the public because it may defeat the process of what the Division's policies are [and] the intent of the legislature. And I don't think any decision in this case would certainly be binding on any other case. The decision of this case would be certainly based upon the facts in this case.

The court then considered the possibility that the child might be harmed by press coverage of the hearing. The court considered the nature of the complaint made by DYFS and determined that the allegations did not involve "any type of sexual abuse or direct insult upon this child." Rather, the complaint concerned "the psychological and psychiatric well-being of the defendant and whether * * * he is capable to carry on his duties as a parent to nurture and care for the child * * *." The court specifically determined that nothing in the complaint would be an "embarrassment" to the child if it became public knowledge. The court therefore concluded that public disclosure of the content of the proceedings would be unlikely to have a detrimental effect on the child.

Although the trial court opened the hearing to the press, the trial court stated that it would close the proceedings at any time, if necessary to protect confidential information from disclosure. Thereafter, the court granted a stay to permit the filing of an interlocutory appeal. The Appellate Division denied the motion for leave to appeal, one member of the panel dissenting. The law guardian filed a motion with the trial court for an additional stay pending appeal to this Court. The trial court denied the petition. The Appellate Division affirmed that denial, as did this Court, thereby permitting the preliminary hearing to go forward. Simultaneously with our denial of the stay, we granted leave to appeal. —— *N.J.* —— (1990).

Under a subsequent court order, the child was returned to defendant's care, subject to DYFS' retention of legal custody. See *N.J.S.A.* 9:6–8.31c. In the trial court's view, that order obviated the need for the preliminary hearing.

■ The trial court order dispensing with the preliminary hearing makes it unnecessary for this Court to resolve the question whether the order permitting press access was error. We observe, however, that the issue of press access to civil hearings of this kind is one of considerable public importance

capable of repetition, yet evading review. *In re Geraghty,* 68 *N.J.* 209, 212, 343 *A.*2d 737 (1975); *see Southern Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 *U.S.* 498, 515, 31 *S.Ct.* 279, 283, 55 *L.Ed.* 310, 316 (1910). We therefore decide the issue presented.

## II.

### A.

In *Richmond Newspapers v. Virginia,* 448 *U.S.* 555, 100 *S.Ct.* 2814, 65 *L.Ed.*2d 973 (1980), the United States Supreme Court first addressed the question whether, consistent with the first amendment, judicial proceedings could be closed to the public. That case involved a murder trial from which the press as well as the general public had been excluded. The Court analyzed the issue in terms of the evolution of the criminal trial in Anglo–American justice, focusing on the fact that criminal trials historically have "been open to all who cared to observe." *Id.* at 564, 100 *S.Ct.* at 2821, 65 *L.Ed.*2d at 982. The materials cited by the Court emphasized that open trials promoted fairness and enhanced public confidence in judicial procedures. *Id.* at 564–73, 100 *S.Ct.* at 2820–25, 65 *L.Ed.*2d at 982–87.

Recognizing that "[t]he Bill of Rights was enacted against the backdrop of the long history of trials being presumptively open," *id.* at 575, 100 *S.Ct.* at 2826, 65 *L.Ed.*2d at 988, the Court explored the relationship between the first-amendment prohibitions on the abridgement of speech, press, and assembly freedoms, and the core purpose of those freedoms: to "assur[e] freedom of communication on matters relating to the functioning of government." *Ibid.* Considering access to judicial proceedings to be bound up with the broader first-amendment "right of access to places traditionally open to the public," *id.* at 577, 100 *S.Ct.* at 2827, 65 *L.Ed.*2d at 989, the Court held that "the right to attend criminal trials is implicit in the guarantees of the First Amendment * * *." *Id.* at 580, 100 *S.Ct.* at 2829,

65 *L.Ed.*2d at 991–92 (footnote omitted). An order to close a criminal trial would therefore require "an overriding interest articulated in findings." *Id.* at 581, 100 *S.Ct.* at 2829, 65 *L.Ed.*2d at 992. Because no such finding had been made, the Court reversed the judgment authorizing the closure of the trial.

*Globe Newspaper Co. v. Superior Court,* 457 *U.S.* 596, 102 *S.Ct.* 2613, 73 *L.Ed.*2d 248 (1982), decided only two years after *Richmond,* clarified the Court's position on the balance between the right of public access to judicial proceedings and state interests militating in favor of closure. *Globe* concerned a Massachusetts statute that excluded the public from trials of specified sexual offenses involving a victim under the age of eighteen. The Supreme Judicial Court of Massachusetts had narrowly construed the statute to *"require* [ ] the closure of sex-offense trials only during the testimony of minor victims; during other portions of such trials, closure was 'a matter within the judge's sound discretion.' " *Id.* at 600, 102 *S.Ct.* at 2617, 73 *L.Ed.*2d at 253 (citation omitted). The Supreme Court reversed, holding that the *mandatory* nature of the closure rule violated the first amendment. *Id.* at 602, 102 *S.Ct.* at 2617–18, 73 *L.Ed.*2d at 254.

In *Globe,* as in *Richmond,* the Court described the constitutional stature of the public's right to access in terms of the beneficial influence of public scrutiny on the judicial process. *Id.* at 605–06, 102 *S.Ct.* at 2619–20, 73 *L.Ed.*2d at 256–57. Although the Court acknowledged that the right of access to criminal trials "is not absolute," it emphasized that "the circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one." *Id.* at 606, 102 *S.Ct.* at 2620, 73 *L.Ed.*2d at 257.

The Court recognized two interests in favoring closure during portions of certain sex-offense trials:

the protection of minor victims of sex crimes from further trauma and embarrassment; and the encouragement of such victims to come forward and testify in a truthful and credible manner. [*Ibid.*]

The Court agreed that the State's interest in safeguarding the physical and psychological well-being of a minor is a compelling one, but rejected the contention that that interest justified a mandatory-closure rule. *Id.* at 607–08, 102 *S.Ct.* at 2620–21, 73 *L.Ed.*2d at 258. Instead, the Court required that the determination "whether closure is necessary to protect the welfare of a minor victim" be made on a case-by-case basis. *Id.* at 608, 102 *S.Ct.* at 2621, 73 *L.Ed.*2d at 258. Because the Massachusetts statute foreclosed such case-by-case determination, the Court held that it was not "narrowly tailored" to serve the State's compelling interests in protecting the welfare of minor victims. *Id.* at 609, 102 *S.Ct.* at 2621, 73 *L.Ed.*2d at 258.

The Court rejected the State's second reason for excluding the press and public from sex-offense trials—"the encouragement of minor victims of sex crimes to come forward and provide accurate testimony," *id.* at 609, 102 *S.Ct.* at 2621, 73 *L.Ed.*2d at 259. It found the assertion to be "speculative in empirical terms" and "open to serious question as a matter of logic and common sense." *Id.* at 609–10, 102 *S.Ct.* at 2621–22, 73 *L.Ed.*2d at 259.

This Court has addressed the issues raised by *Richmond* and *Globe* in the context of the public's right of access to criminal pretrial hearings. *State v. Williams*, 93 *N.J.* 39, 459 *A.*2d 641 (1982). In *Williams*, we perceived "a confluence of the federal and State constitutions in terms of substantive concerns and interpretive philosophy" that brought us "to the conclusion that a public right of access to pretrial proceedings in criminal cases is embraced by both constitutions." *Id.* at 51, 459 *A.*2d 641. Notwithstanding our belief "that the federal constitutional right of access extend[ed] to criminal pretrial proceedings," we acknowledged the lack of a definitive Supreme Court determination on the question and "consider[ed] the State Constitution as an alternative basis for the public's right of access" to

criminal pretrial proceedings. *Id.* at 57, 459 *A.*2d 641. The Supreme Court subsequently decided that "the guarantees of open public proceedings in criminal trials" included pretrial proceedings involving *voir dire* examination of potential jurors. *Press–Enterprise Co. v. Superior Court,* 464 *U.S.* 501, 503, 104 *S.Ct.* 819, 820, 78 *L.Ed.*2d 629, 634 (1984).

Subsequent federal-circuit-court cases interpreted *Richmond, Globe,* and *Press–Enterprise* to imply a right of public access to civil-court proceedings and to items in the record of such proceedings. *See Rushford v. New Yorker Magazine, Inc.,* 846 *F.*2d 249, 253 (4th Cir.1988); *Westmoreland v. Columbia Broadcasting Sys.,* 752 *F.*2d 16, 22–23 (2d Cir.1984), *cert. denied,* 472 *U.S.* 1017, 105 *S.Ct.* 3478, 87 *L.Ed.*2d 614 (1985); *Publicker Indus. v. Cohen,* 733 *F.*2d 1059, 1067–71 (3d Cir. 1984); *Brown & Williamson Tobacco Corp. v. Federal Trade Comm'n,* 710 *F.*2d 1165, 1177–79 (6th Cir.1983). Those courts observed that the rationale underlying the right of access to criminal trials applies with equal force to civil trials. *See Westmoreland, supra,* 752 *F.*2d at 23; *Publicker, supra,* 733 *F.*2d at 1070. The history of civil jurisprudence, like that of criminal law, reveals a tradition of public access. *Id.* at 1068–70. The source materials cited by the Supreme Court in *Richmond* apply to *civil* as well as criminal trials. For example, the *Richmond* Court referred to a colonial-era document known as The 1677 Concessions and Agreements of West New Jersey, which provided:

> That in all public courts of justice for tryals of causes, *civil or criminal,* any person or persons, inhabitants of the said Province may freely come into, and attend the said courts, and hear and be present, at all or any such tryals as shall be there had or passed, that justice may not be done in a corner nor in any covert manner. [448 *U.S.* at 567, 100 *S.Ct.* at 2822, 65 *L.Ed.*2d at 983–84 (emphasis added).]

Public confidence in the judiciary and the first amendment's "core purpose of assuring freedom of communication on matters relating to the functioning of government," *Richmond, supra,* 448 *U.S.* at 575, 100 *S.Ct.* at 2826, 65 *L.Ed.* at 988, are promoted as well by public access to civil trials as they are by

openness in criminal proceedings. *Publicker, supra,* 733 *F.*2d at 1070. Thus, the federal circuit courts recognize a presumption of openness rising to the level of a constitutional interest in access to judicial proceedings in civil matters.

The public's right of access to judicial proceedings is not, however, absolute. *Globe, supra,* 457 *U.S.* at 606, 102 *S.Ct.* at 2620, 73 *L.Ed.*2d at 257; *Publicker, supra,* 733 *F.*2d at 1070. "The exercise of these rights can conflict with other rights and interests of equal magnitude." *Williams, supra,* 93 *N.J.* at 59, 459 *A.*2d 641. In accordance with *Globe,* where the public's right to attend the criminal trial itself is at issue, the test is whether the denial of access "is necessitated by a compelling government interest, and is narrowly tailored to serve that interest." *Globe, supra,* 457 *U.S.* at 607, 102 *S.Ct.* at 2620, 73 *L.Ed.*2d at 257 (citations omitted; footnote omitted). In *Press–Enterprise,* where the protected interest was the right to attend pretrial *voir dire* of potential jurors, the Court rephrased the standard for denial of access while leaving its substance intact:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. [464 *U.S.* at 510, 104 *S.Ct.* at 824, 78 *L.Ed.*2d at 638.]

In *Williams,* confronted with the conflict between the public's first-amendment access rights and the criminal defendant's right to a fair trial before an impartial jury, we held that "[a]ll pretrial proceedings in criminal prosecutions shall be open to the public and the press" unless

> the trial court is clearly satisfied that if the pretrial proceeding is conducted in open court there is a realistic likelihood of prejudice to a fair trial by an impartial jury as a result of adverse publicity, and, further, that such prejudice cannot be overcome by resort to various methods relating to the selection of jurors that will be available to the court at the time of trial. [93 *N.J.* at 63, 459 *A.*2d 641.]

The Third and Fourth Circuits have adopted a distinct and apparently less-stringent standard for denial of public access to civil proceedings and documents:

> [T]o limit the public's access to civil trials there must be a showing that the denial serves an important governmental interest and that there is no less restrictive way to serve the governmental interest.

*Publicker, supra,* 733 *F.*2d at 1070 (proceedings) (citations omitted); *Rushford, supra,* 846 *F.*2d at 253 (documents).

To summarize, the cases demonstrate that there is an interest, constitutional in dimension, protecting the public's right of access to criminal trials and proceedings. *Press–Enterprise, supra,* 464 *U.S.* 501, 104 *S.Ct.* at 819, 78 *L.Ed.*2d 629; *Richmond, supra,* 448 *U.S.* at 580, 100 *S.Ct.* at 2829, 65 *L.Ed.*2d at 992; *Williams, supra,* 93 *N.J.* at 51, 459 *A.*2d 641. The societal and institutional values served by open access to criminal proceedings are also implicated in civil proceedings. *Westmoreland, supra,* 752 *F.*2d at 23; *Publicker, supra,* 733 *F.*2d at 1070; *Brown & Williamson, supra,* 710 *F.*2d at 1179. Where a constitutional right of access to a particular type of proceeding has been found, *per se* rules of closure are inappropriate, even where the rule advances a compelling state interest. *Globe, supra,* 457 *U.S.* at 607–08, 102 *S.Ct.* at 2620–21, 73 *L.Ed.*2d at 258. A case-by-case determination of the need for closure is necessary in order to narrowly tailor the restriction to the governmental interest served. *Id.* at 608–09, 102 *S.Ct.* at 2621, 73 *L.Ed.*2d at 258–59. In cases involving the State's compelling interest in safeguarding the physical and psychological well-being of minors, trial courts should weigh a variety of factors relating to the actual effect of open proceedings on the particular child. *See ibid.*

### B.

█ DYFS is authorized to initiate prosecutions that will terminate parental rights completely or will temporarily deprive a parent of custody of a child. *N.J.S.A.* 30:4C–4, –11; *N.J.S.A.* 9:6–8.29. Such cases implicate weighty, frequently conflicting interests.

> Termination of parental rights presents the legal system with an almost insoluble dilemma. On the one hand, we emphasize the inviolability of the

family unit, noting that "[t]he rights to conceive and to raise one's children have been deemed 'essential,' * * * 'basic civil rights of man,' * * * and '[r]ights far more precious * * * than property rights' * * *." *Stanley v. Illinois*, 405 *U.S.* 645, 651, 92 *S.Ct.* 1208, 1212, 31 *L.Ed.*2d 551, 558 (1972) (citations omitted). The interests of parents in this relationship have thus been deemed fundamental and are constitutionally protected. On the other hand, it has been recognized "that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham v. J.R.*, 442 *U.S.* 584, 603, 99 *S.Ct.* 2493, 2504, 61 *L.Ed.*2d 101, 119 (1979) (citing *Wisconsin v. Yoder*, 406 *U.S.* 205, 230, 92 *S.Ct.* 1526, 1540, 32 *L.Ed.*2d 15, 33 (1972)). [*New Jersey Div. of Youth & Family Servs. v. A.W.*, 103 *N.J.* 591, 599, 512 *A.*2d 438 (1986).]

The statutes under which DYFS is authorized to initiate proceedings advance important public policies. The child-abuse act, *L.*1971, *c.* 437, "provide[s] for the protection of children under 18 years of age who have had serious injury inflicted upon them by other than accidental means." *N.J.S.A.* 9:6–8.8. Title 30, which empowers DYFS to act in child-welfare cases, provides "[t]hat the preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare;" and "[t]hat the prevention and correction of dependency and delinquency among children should be accomplished so far as practicable through welfare services which will seek to continue the living of such children in their own homes[.]" *N.J.S.A.* 30:4C–1(a) and (b).

DYFS custody prosecutions regularly involve allegations of abuse and neglect. Such prosecutions are often burdened by significant difficulties. *Cf. State v. D.R.*, 109 *N.J.* 348, 358–63, 537 *A.*2d 667 (1988) (discussing difficulties inherent in sex-abuse prosecutions in context of tender-years hearsay-rule exception). The United States Supreme Court has observed that

[c]hild abuse is one of the most difficult crimes to detect and prosecute, in large part because there often are no witnesses except the victim. A child's feelings of vulnerability and guilt, and his or her unwillingness to come forward are particularly acute when the abuser is a parent. [*Pennsylvania v. Ritchie*, 480 *U.S.* 39, 60, 107 *S.Ct.* 989, 1003, 94 *L.Ed.*2d 40, 59 (1987).]

Those observations apply to civil proceedings as well as to criminal prosecutions based on alleged child abuse. Relatives and neighbors who suspect abuse may be unwilling to come forward if they know their identities will not be protected.

*Ibid.* Moreover, the victim's reluctance to testify is intensified by fear of public degradation, humiliation, and demoralization. *Cf. In re VV Publishing Corp.*, 120 *N.J.* 508, 512, 577 *A.*2d 412 (1990) (in widely-publicized sexual-assault case "[a]lthough children's testimony was critical to the State's case, many of their parents were reluctant to permit them to testify * * *."). Thus, the State has an interest in "the protection of minor victims of sex crimes from further trauma and embarrassment * * *." *Globe, supra,* 457 *U.S.* at 607, 102 *S.Ct.* at 2620, 73 *L.Ed.*2d at 257. Confidentiality is therefore an important component in the successful prosecution of abuse and neglect cases.

Our State statutory scheme and Court Rules advance the State's interest in encouraging the witnesses and victims of child abuse to testify. Records of child-abuse reports are kept confidential and may be disclosed only under limited circumstances. *N.J.S.A.* 9:6–8.10. *Rule* 5:12–4 requires the closure of hearings brought under Title 30. *Rule* 5:3–2 permits closure of proceedings brought pursuant to Title 9. Legislation enacted this year requires that fictitious names replace the real names of child victims of sexual abuse in all DYFS actions brought pursuant to Title 9. *L.*1989, *c.* 336, § 1 (codified at *N.J.S.A.* 2A:82–46). Minor victims of sex abuse are permitted to testify via closed circuit television in cases in which "the court finds * * * that there is a substantial likelihood that the witness would suffer severe emotional or mental distress if required to testify in open court." *N.J.S.A.* 2A:84A–32.4.

Our decisional law has also recognized the State's interests in eliciting testimony of child abuse and in protecting the confidentiality of records relating to such abuse. *See, e.g., In re Tenure Hearing of Tyler,* 236 *N.J.Super.* 478, 566 *A.*2d 229 (App.Div.1989) (upholding State Board of Education interpretation of *N.J.S.A.* 9:6–8.10a that would prohibit disclosure of confidential DYFS files in context of hearing to determine appropriate penalty to be imposed for conduct unbecoming a teacher); *State v. Cusick,* 219 *N.J.Super.* 452, 530 *A.*2d 806

(App.Div.1987) (trial court's refusal to grant defendant access to DYFS files concerning sexual assault on defendant's eight-year-old son did not violate defendant's right to confront witnesses against him); *Kaszerman v. Manshel*, 176 *N.J.Super.* 132, 422 *A.*2d 449 (App.Div.1980) (affirming trial-court ruling denying father suspected of child abuse access to confidential DYFS files for purpose of compiling documentation for potential lawsuits). *But see In re Tenure Hearing of Wolf*, 231 *N.J.Super.* 365, 555 *A.*2d 722 (App.Div.) (exclusion of teacher from courtroom during child's testimony involving sex abuse at State Board of Education hearing was fundamentally unfair), *certif. denied*, 117 *N.J.* 138, 564 *A.*2d 862 (1989).

### III.

There is an expectation based in history and the first amendment, and embodied in our Court Rules, see *R.* 1:2-1, that civil trials and proceedings will be open to the public. That expectation may be overcome when an important state interest is at stake.

The compelling state interest in protecting victims of child abuse from the embarrassment of testifying in an open courtroom, with the attendant possibility of media coverage, justifies a presumption that DYFS proceedings initiated under Title 30 or Title 9 will be closed to the public. The presumption of closure does not, however, equate with a mandatory rule. Members of the public, including the press, must be free to make application to the trial court to be permitted to attend DYFS proceedings. Under those circumstances, the court must balance the public's right of access to judicial proceedings against the State's interest in protecting children from the possible detrimental effects of revealing to the public allegations and evidence relating to parental neglect and abuse. The factual settings presented in the vast majority of DYFS cases involve allegations that warrant closure. *See, e.g., New Jersey Div. of Youth & Family Servs. v. V.K.*, 236 *N.J.Super.* 243, 565

*A.*2d 706 (App.Div.1989) (involving allegations of parental history of emotional instability and inability to control behavior combined with physical and sexual abuse), *cert. denied,* —— *U.S.* ——, 110 *S.Ct.* 2178, 109 *L.Ed.*2d 507 (1990); *In re Maraziti,* 233 *N.J.Super.* 488, 559 *A.*2d 447 (App.Div.1989) (DYFS interviews revealed father had had sexual intercourse and oral sex with daughter); *W.W. v. I.M.,* 231 *N.J.Super.* 495, 499, 555 *A.*2d 1149 (App.Div.1989) (allegations of child neglect involving substandard conditions of family home, including "clothing and old food * * * everywhere," "piles of medical bottles, dirty pots and dishes, dried dog feces in several of the rooms," "a decomposing dead rat * * * and starving kittens [sic]," "bare electrical wires in the hallway, "flies and fleas"); *In re D.T.,* 229 *N.J.Super.* 509, 552 *A.*2d 189 (App.Div.1988) (four-month-old sexual-abuse victim); *In re Guardianship of J.E.D.,* 217 *N.J.Super.* 1, 524 *A.*2d 1255 (App.Div.1987) (parental rights termination based on physical abuse included allegations that mother hit daughter); *In re J.P.,* 198 *N.J.Super.* 166, 486 *A.*2d 907 (App.Div.1985) (child beating); *In re Guardianship of J.P.M.,* 210 *N.J.Super.* 512, 510 *A.*2d 117 (Ch.Div.1985) (termination of parental rights based on father's incarceration as well as history of physical abuse, including beating, kicking, pushing, grabbing and bruising child). *But see In re D.N.,* 190 *N.J.Super.* 648, 464 *A.*2d 1221 (J. & D.R.Ct.1983) (regarding termination of parental rights of parents who were mentally retarded, where no abuse was shown but parents were found to be intellectually and emotionally incapable of successfully rearing child). It will be the unusual case in which a factual context that poses no danger of trauma or embarrassment to the child coincides with the general public's interest in following the proceedings.

 Courts undertaking that weighing process should consider the nature of the allegation underlying the DYFS complaint. When, for example, sexual abuse is alleged, it is virtually inconceivable that a court could conclude that the best interests of the child would be served by an open proceeding. Similarly, any allegation of physical or psychological abuse or

of serious neglect should weigh heavily, if not conclusively, in favor of the closure. The age and maturity of the child also should be considered. Children who must face their peers in school might be subject to special pressures of which the court should be aware. The possibility that a child might be adversely affected by future revelation of embarrassing facts also should weigh heavily in the court's determination. Thus, we believe that in the ordinary DYFS proceeding brought under either Title 9 or Title 30, the weighing of the state's interest in privacy against the public's interest in access will result in a determination that the proceeding should be conducted in private.

 This case involved the rare situation in which the public's right to attend judicial proceedings is not outweighed by the state's compelling interest in conducting a private hearing. The trial court found that the allegations underlying the Division's complaint did not involve "any type of sexual abuse or direct insult on [the] child." The court found that the complaint related to defendant's "psychological and psychiatric well-being" and his capacity to carry out his duties as a parent. The court emphasized that nothing in the allegations would, if revealed, have the capacity to burden the child, and found additionally that because the child was very young, revelation of the allegations concerning defendant's psychological well-being would be unlikely to have any effect on the child now or at any future time. The court's thoughtful and thorough analysis of those factors convinces us that the court order admitting the press to the pretrial hearing was not an abuse of discretion.

Judgment affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal*—None.