900 A.2d 335

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF, v. T.H. AND W.W., DEFENDANTS,IN THE MATTER OF T.W. AND X. W., MINORS.

Superior Court of New Jersey
Chancery Division–Family Part,
Monmouth County

Decided January 20, 2006.

*Ann Marie Seaton,* Senior Deputy Attorney General, for New Jersey Division of Youth and Family Services (*Peter C. Harvey,* Attorney General, attorney).

*Caridad Argote–Freyre,* Assistant Deputy Public Defender, for the minor children, T.W. and X.W., (*Yvonne Smith Segars,* Public Defender, Law Guardian).

*Laurie B. Gerhardt,* Assistant Prosecutor for the State of New Jersey (*Luis A. Valentin,* Monmouth County Prosecutor, attorney).

*Frank Howley* and *David A. Schwartz,* for defendant T.H.

*Russell Heckler* and *J. Michael Wicke,* Assistant Deputy Public Defender, for defendant W.W. (*Yvonne Smith Segars,* Public Defender, attorney in the criminal matter).

GUADAGNO, J.S.C.

Defendant, T.H., seeks to compel disclosure of confidential Division of Youth and Family Services (DYFS or the Division) records that might assist her and her paramour, W.W., in defending against criminal charges of aggravated manslaughter and endangering the welfare of a child relating to the death of their infant son, J.W. This matter involves parallel criminal and Title 9 [1] proceedings with an unusual alliance of parties, in that the county prosecutor, who brought the criminal indictment, supports T.H.'s motion, while DYFS and the law guardian appointed to represent the children in the DYFS case, oppose it.

---

[1] "Title 9" is used herein to describe investigatory and other activities carried out by the Division pursuant to its duties to safeguard children under *N.J.S.A.* 9:6–1 *et. seq.*

## I

On August 22, 2004, at approximately 4:15 p.m., W.W. noticed that his 14 month old son J.W. had stopped breathing. He told his paramour T.H.[2] to call 911 and he began CPR on the child. By the time the emergency responders arrived, J.W. was dead. The child's death was deemed suspicious and the county prosecutor began a criminal investigation. The police notified DYFS as mandated by *N.J.S.A.* 9:6–8.10, and later that day, DYFS took custody of the defendants' two other children, two-year old T.W. and three-month old X.W., pursuant to a 15–day informed consent signed by both defendants. After medical evaluations the children were placed with a maternal cousin.

Following J.W.'s death, DYFS began an investigation ("the DYFS matter"). DYFS had first become involved with this family on June 23, 2004, when a visiting nurse reported that X.W., who was born twelve days earlier with numerous medical problems, had not been receiving her treatments for anemia. A DYFS case worker visited the home and, after T.H. agreed to comply with the infant's treatment schedule, the case was closed on July 16, 2004, without substantiating neglect.

On September 1, 2004, DYFS filed a complaint seeking custody of T.W. and X.W., alleging that the defendants abused and neglected all three children. On October 14, 2004, Judge James McGann, who was overseeing the DYFS matter at the time, entered an order prohibiting DYFS from releasing any records absent a court order ("the Protective Order").

On February 28, 2005, a fact finding hearing was held pursuant to *N.J.S.A.* 9:6–8.46 to determine whether the children were abused or neglected. DYFS introduced medical records of all three children, photographs, medical consultant reports and the autopsy report on J.W. which contained the conclusion that the

---

[2] T.H. and W.W. are not married but are the biological parents of J.W., T.W. and X.W.

cause of death was severe malnutrition. The medical examiner termed the death a homicide.

On June 3, 2005, defendants were indicted by a Monmouth County grand jury and charged with first degree aggravated manslaughter in violation of *N.J.S.A.* 2C:11-4 and second degree endangering the welfare of a child in violation of *N.J.S.A.* 2C:24-4. Both defendants obtained separate counsel for the criminal case.

On August 2, 2005, DYFS moved for a judicial determination that the evidence supported a finding that the acts of the parents constituted aggravated child abuse and that DYFS should be relieved of any duty to make reasonable efforts for reunification under *N.J.S.A.* 30:4C-11.3(a).

On August 4, 2005, Judge McGann found by clear and convincing evidence that the defendants committed child abuse by allowing J.W. to starve to death. Judge McGann further found that T.W. was also the victim of physical abuse and relieved DYFS of any duty to reunify the defendants with the surviving children.

On August 15, 2005, T.H.'s criminal counsel filed the instant motion before Judge McGann seeking disclosure of the DYFS file. Counsel also seeks access to, inter alia, any interviews conducted by DYFS with respect to fact witnesses that may be relevant and may contain exculpatory material, material affecting witness credibility or material which may be used upon rebuttal in the criminal case. Counsel also requests that the full DYFS investigative file be disclosed, arguing that this report "may provide documents which are material to [T.H.'s] defense of the criminal case and or the credibility of witnesses." T.H.'s counsel in the DYFS matter, who originally joined in the application for the protective order, now supports T.H.'s motion for the release of the documents as do the attorneys representing W.W. in both the DYFS and criminal matters.

On August 23, 2005, the Monmouth County Prosecutor filed a supporting cross motion seeking disclosure of all DYFS records except psychiatric, psychological or mental health evaluations or

reports. Both requests are opposed by DYFS and the Law Guardian for T.W. and X.W. The motion was argued on November 14, 2005, and on December 8, 2005, W.W.'s criminal counsel joined in the original motion and the prosecutor's cross motion.

On September 19, 2005, a hearing was held and this court [3] ordered that the permanency plan for the minor children would be kinship legal guardianship with a paternal aunt.

On November 17, 2005, DYFS moved to amend the complaint pursuant to *N.J.S.A.* 30:4C–87a, seeking kinship legal guardianship. Both defendants consented to the appointment of the paternal aunt as the kinship legal guardian for the minor children T.W. and X.W. This concluded the DYFS case.

## II

The statutory authority and case law promotes confidentiality in records relating to child abuse and neglect.[4] This policy exists to encourage the reporting of child abuse and to facilitate the ability of witnesses and case workers to testify. *See N.J. Div. of Youth & Family Servs. v. J.B.*, 120 *N.J.* 112, 126, 576 *A.*2d 261 (1990). These confidentiality provisions, however are not absolute. DYFS is authorized to disclose records of child abuse reports to a court "upon its finding that access to such records may be necessary for determination of an issue before it, and such records may be disclosed by the court ... in whole or in part to the law guardian, attorney or other appropriate person upon a finding that such

---

[3] In August 2005 this case was transferred to this court.

[4] *N.J.S.A.* 9:6–8.10(a) requires confidentiality, stating in pertinent part:

All records of child abuse reports made pursuant to section 3 of P.L. 1971, c. 437 (C. 9:6–8.10), all information obtained by the Division of Youth and Family Services in investigating such reports including reports received pursuant to section 20 of P.L. 1974, c. 119 (C. 9:6–8.40), and all reports of findings forwarded to the central registry pursuant to section 4 of P.L. 1971, c. 437 (C. 9:6–8.11) shall be kept confidential and may be disclosed only under the circumstances expressly authorized under subsection b. herein.

further disclosure is necessary for determination of an issue before the court ..." *N.J.S.A.* 9:6–8.10a(b)(6).

Here, the family court matter has been resolved; the only outstanding matter is the criminal case. While the statute does not expressly speak to disclosure of DYFS records in a parallel criminal matter, the applicability is obvious. Indeed, the assistant prosecutor noted during oral argument that, prior to October 14, 2004, there had been a "free flow" of information between DYFS and the prosecutor's office which ended abruptly after the entry of the Protective Order. She further claimed that DYFS has conducted additional interviews and collected additional information regarding the three children which may be material to the pending prosecution or even lead to additional charges relating to abuse of the surviving children.

The law mandates cooperation when there are parallel criminal and DYFS child abuse investigations. *See N.J. Div. of Youth & Family Services v. Robert M.,* 347 *N.J.Super.* 44, 63, 788 *A.*2d 888, (App.Div.), *cert. denied,* 174 *N.J.* 39, 803 *A.*2d 635 (2002). Title 9 contemplates criminal prosecution of acts of abuse and neglect that constitute crimes. *N.J.S.A.* 9:6–8.36 specifically requires that DYFS "immediately report all instances of suspected child abuse and neglect ... to the county prosecutor." Once DYFS files a child abuse complaint, the Family Part is required to immediately send a copy of the complaint to the county prosecutor. *N.J.S.A.* 9:6–8.25. Likewise, if the prosecutor decides to bring a criminal case, the DYFS caseworker must be advised. *N.J.A.C.* 10:129–1.5(c).

While the Division must maintain strict confidentiality of records and reports of child abuse, the statute provides an exception allowing release of such information to law enforcement agencies investigating child abuse. *N.J.S.A.* 9:6–8.10a(b)(2).

Title 9 also contemplates the institution of a criminal action against the parent or guardian even as the child abuse action continues in the Family Part, as was done in this case. *N.J.S.A.* 9:6–8.24d. As Chief Justice Poritz explained, "[t]he criminal justice

system acts separately, but in tandem with the civil system, to investigate and prosecute those who abuse and neglect children. To the extent that the prospect of criminal prosecution serves as a deterrent to child abuse, the criminal justice system also protects children." *State v. P.Z.* 152 *N.J.* 86, 100, 703 *A.*2d 901 (1997). It would be counter productive to prohibit disclosure in the parallel criminal matter given the statutory requirement that the criminal prosecutor and the Division work together to prevent and to punish child abuse.

There are fundamental differences between DYFS matters and criminal matters, as evidenced by the rules of confidentiality and the underlying presumption that DYFS hearings are closed to the public. However, there are occasions where compelling public policy may result in a DYFS hearing being opened to the public. *J.B., supra* at 127, 576 *A.*2d 261. In *J.B.* the Supreme Court held that "the court must balance the public's right of access to judicial proceedings against the State's interest in protecting children from the possible detrimental effects of revealing to the public allegations and evidence relating to parental neglect and abuse." *Id.,* at 127, 576 *A.*2d 261. Similarly, DYFS has been compelled to provide information on children who are in state custody to newspapers where the public interest outweighs the privacy concerns of the State. *C.H & N.H v. Whitman,* 213 *F.R.D.* 240 (D.N.J.2003).

In a Pennsylvania case involving an allegation of sexual abuse of a daughter by her father, the United States Supreme Court ordered such disclosure where the issue was whether denying defendant access to the entire Child Welfare Services file on the victim, pursuant to a statutory privilege of confidentiality, had infringed defendant's Sixth Amendment rights. *Pennsylvania v. Ritchie,* 480 *U.S.* 39, 107 *S.Ct.* 989, 94 *L.Ed.*2d 40(1987). The Court noted that while the public interest in protecting sensitive information relating to child abuse was strong, this interest did not prevent disclosure in all circumstances and that relevant confidential information may be disclosed "when a court of compe-

tent jurisdiction determines that the information is 'material' to the defense of the accused." *Id.,* at 57–58, 107 *S.Ct.* at 1001–1002, 94 *L.Ed.*2d at 57–58. In adopting a due process analysis, the Court held "[a] defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files." *Id.,* at 59, 107 *S.Ct.* at 1002, 94 *L.Ed.*2d at 58. In granting disclosure only for material evidence, i.e. that is, evidence which might alter the result of a proceeding if disclosed, the Court sought to prevent a fishing expedition of investigative files, from which defense counsel could argue relevance. Full disclosure of investigative files would sacrifice the State's compelling interest in preserving the confidentiality of its child abuse records. The Court held that the State and defendant's interest in "ensuring a fair trial can be protected fully by requiring that the [Child Welfare] files be submitted only to the trial court for in camera review." *Id.,* at 60, 107 *S.Ct.* at 1002–1003, 94 *L.Ed.*2d at 59.

*Ritchie,* suggests two options as to how counsel can obtain confidential information by court order: 1) submission of a list of known information to the Court with an argument as to why they are material; or 2) an in-camera review by the trial court of an investigative file for material information that should be disclosed.

The procedure approved in *Ritchie* has been followed in *State v. Cusick,* 219 *N.J.Super.* 452, 530 *A.*2d 806 (App.Div.1987). In *Cusick* the Appellate Division considered whether the trial court's refusal to grant access to DYFS files violated the Sixth Amendment right to confront witnesses in a criminal matter charging the sexual assault of an eight-year old boy by his father. The trial court in *Cusick,* adopted the approach suggested by the Supreme Court in *Ritchie* and conducted an in-camera review of the file to assess whether there was any material or exculpatory evidence that should be provided to the defense. After the review, the trial court refused to order discovery that could have been obtained elsewhere. The panel affirmed the defendant's conviction, agreeing with the trial court that "the information was available else-

where and that, regardless of its availability through other sources, the information was not determinative of any issues before the court or necessary for the conduct of the proceedings." *Id*, at 463, 530 *A.*2d 806.

Defendant T.H. argues that disclosing DYFS information to one of her attorneys but not the other will impede her attorney-client relationship. While it is clear that T.H. enjoys attorney-client relationships with both her criminal and DYFS counsel, there has been no showing that either relationship is in any way impaired by the fact that the attorneys may receive different discovery in their respective cases. The issue here is one of disclosure, not one of privilege.

Defendant T.H. next argues that DYFS has already disclosed confidential information to her and she "does not want to play a guessing game" as to what information is or is not confidential. Again, defendant has failed to show how this situation has caused her any prejudice. She is not being called upon to identify confidential information or distinguish discovery provided in one case from the other.

Defendant argues that due process requires complete disclosure and cites *In re Maraziti*, 233 *N.J.Super.* 488, 496, 559 *A.*2d 447 (App.Div.1989). *Maraziti* involved a defendant charged with sexually abusing his two minor daughters. DYFS began an investigation and a law guardian, who was appointed to represent the children, interviewed them and took written notes. The trial court ordered an in camera review of the DYFS file but directed the law guardian to produce her written notes to the defendant. While DYFS complied with the court order, the law guardian appealed. The Appellate Division reversed the trial judge holding that the communications between the law guardian and the children were covered by the attorney-client privilege and not subject to pre-trial discovery. Citing *Ritchie*, the panel acknowledged that the defendant had a due process right to present a defense but rejected defendant's argument that his children's attorney-client

privileges must yield to his due process rights. *Maraziti, supra* at 495, 559 *A.*2d 447.

Here, T.H. is seeking access to the DYFS file, not privileged communications. As the *Ritchie* court carefully noted, the agency's records, although ordinarily confidential, were not the subject of any statutory privilege which would protect them from disclosure in judicial proceedings. *Ritchie, supra,* 480 *U.S.* at 57–58, 107 *S.Ct.* at 1001–1002, 94 *L.Ed.*2d at 57–58.

Clearly, there is a possibility that the DYFS file may contain records that defendants T.H. and W.W. are entitled to in the criminal case. While the court is not inclined to grant criminal counsel unfettered access to the DYFS file, it is clear that some discovery scheme consistent with *N.J.S.A.* 9:6–8.10a. must be implemented. An in camera review seems the most effective way to safeguard defendants' Sixth Amendment right to confront witnesses and their Fifth Amendment right of due process while avoiding a fishing expedition. *See Cusick, supra* 219 *N.J.Super.* at 459, 530 *A.*2d 806.

While this court could undertake the review, the judge assigned to the criminal case is in a better position to determine whether material in the DYFS file is relevant to the criminal matter and should be disclosed. Indeed, both *Ritchie* and *Cusick,* involve a determination of disclosure by the criminal court and not the family court.

Accordingly, DYFS shall produce all documents and materials in its possession, custody and control pertaining to the above captioned matter to the trial judge in the criminal action within 30 days of the date of this decision for the purpose of an in-camera review to determine if any of the documents should be disclosed to the parties. An appropriate Order has been executed and filed. Conformed copies follow this memorandum of decision. The moving party shall provide a copy of this memorandum and order to all parties within seven days of the date of their entry.