**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1852-22

S.B.B.,[1]

    Plaintiff-Respondent,

v.

L.B.B.,

    Defendant-Respondent.

_____

Submitted April 30, 2024 – Decided February 27, 2025

Before Judges Gooden Brown and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FV-20-1159-21.

American Civil Liberties Union of New Jersey Foundation, Sandra Park (American Civil Liberties Union), and Vera Eidelman (American Civil Liberties Union) of the New York and California bars, admitted pro hac vice, attorneys for appellants amici curiae American Civil Liberties Union of New Jersey Foundation, American Civil Liberties Union, Jewish

---

[1] We use initials to protect the parties' privacy and the confidentiality of the proceedings in accordance with Rule 1:38-3(d)(10).

Orthodox Feminist Alliance, Sanctuary for Families, and Unchained At Last (Jeanne LoCicero, Shira Wisotsky, Liza Weisberg, Sandra Park, and Vera Eidelman, on the briefs).

Haber Silver Russoniello & Dunn, attorneys for appellants amici curiae Organization for the Resolution of Agunot and Shalom Task Force,[2] join in the briefs of appellants amici curiae American Civil Liberties Union of New Jersey Foundation, American Civil Liberties Union, Jewish Orthodox Feminist Alliance, Sanctuary for Families, and Unchained At Last.

LisaBeth Klein, attorney for respondent S.B.B.

Skoloff & Wolfe, PC, attorneys for respondent L.B.B. (Jane J. Felton, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, P.J.A.D.

This appeal is related to a since-resolved domestic violence matter, S.B.B. v. L.B.B., 476 N.J. Super. 575 (App. Div. 2023), certif. denied, 256 N.J. 434 (2024).  In S.B.B.,

> [d]efendant L.B.B. appeal[ed] from the entry of a final restraining order (FRO) entered against her in favor of her estranged husband, plaintiff S.B.B., pursuant to the Prevention of Domestic Violence Act (PDVA),

---

[2]  Amici curiae Organization for the Resolution of Agunot and Shalom Task Force did not file a notice of appeal but are nonetheless designated as appellants by the Clerk's office.

N.J.S.A. 2C:25-17 to -35.[3] The FRO was based on the predicate act of harassment. The communication underlying the trial judge's finding of harassment was defendant's creation and dissemination of a video accusing her estranged husband of improperly withholding a get, a Jewish bill of divorce, and asking community members to "press" her husband to deliver the get. Because defendant's communication constituted constitutionally protected free speech, we reverse[d].

[Id. at 584.]

We therefore vacated the FRO and directed that the temporary restraining order (TRO) not be reinstated. Id. at 609.

Given the subject matter, pursuant to a protective order, the record was sealed in the trial court as well as on appeal, and litigants were forbidden from disseminating any information about the case to the public. See N.J.S.A. 2C:25-33(a) ("All records maintained pursuant to [the PDVA] shall be confidential and shall not be made available to any individual or institution except as otherwise provided by law."); R. 1:38-3(d)(9) and (10) (excluding from public access domestic violence records maintained pursuant to N.J.S.A. 2C:25-33 and the names and addresses of domestic violence victims, respectively).

---

[3] The domestic violence allegations arose in the midst of the parties' long and contentious divorce litigation, during which each party sought a restraining order against the other. However, defendant's attempt to obtain an FRO against plaintiff was unsuccessful. S.B.B., 476 N.J. Super. at 584 & n.2.

During the appeal of the underlying domestic violence matter, a host of amici joined the case in support of defendant's position: the American Civil Liberties Union of New Jersey (ACLU-NJ), the American Civil Liberties Union, the Jewish Orthodox Feminist Alliance, Sanctuary for Families, and Unchained at Last (collectively, ACLU amici), as well as the Organization for the Resolution of Agunot (ORA) and the Shalom Task Force (collectively, ORA amici).[4] Each was automatically subject to the sealing restrictions and precluded from any public dissemination of information about the case.

As a result, the case split into two parallel tracks, the appeal of the underlying FRO on one hand (the FRO litigation), and amici and defendant's attempts to dissolve the seal on the other (the sealing litigation). Before we issued S.B.B., amici and defendant petitioned this court for relief from the sealing restrictions, but we denied the requests. Amici then appealed to our Supreme Court, which remanded the matter to the trial court for consideration of less-restrictive alternatives to the complete seal.

On remand, the trial court entered a January 12, 2023 order, leaving the seal in place and concluding that no less restrictive alternatives would be

---

[4] We sometimes refer to the ACLU amici and the ORA amici collectively as amici.

sufficient to overcome the need to protect the victim. Amici now appeal from the January 12, 2023 order, specifically seeking the right to disseminate and discuss their briefs subject to certain redactions to protect the parties' anonymity. While this appeal was pending, we issued S.B.B., resolving the underlying FRO appeal in defendant's favor. Thereafter, defendant moved for a complete unsealing of the record. We reserved decision on defendant's motion for consideration in conjunction with amici's appeal of the January 12, 2023 order.

For the reasons that follow, we now reverse the January 12, 2023 order, unseal the briefs, and allow the litigants to discuss their contents publicly. We also provisionally grant defendant's motion to unseal the broader record, but order a limited remand to allow the litigants to identify any discrete pieces of information that should remain confidential.

## I.

Initially, only the parties and their attorneys were given access to the record of the underlying domestic violence matter, with the directive that they be used solely for purposes of trial and appellate litigation and that confidentiality be maintained. On December 3, 2021, while the appeal of the FRO was pending, the trial court entered an amended protective order on defendant's motion permitting "potential amicus curiae" to have access to the

record, provided they agreed to be bound by the confidentiality provisions and not disclose any information about the case to the public.

After the ACLU and ORA amici were granted leave to participate in the FRO appeal, on February 4, 2022, they filed a joint motion with this court to unseal their briefs to allow them to publicize the contents, subject to redactions to ensure the parties' privacy. The proposed redactions included referring to the parties by their first initials only, omitting the docket number, and deleting any direct quotations to the evidentiary record developed at the FRO hearing. A note on the brief's cover page would explain the redactions and their purpose. Similarly, on February 22, 2022, defendant moved before this court to unseal the record and "confirm[] that there [were] no prior restraints on defendant's right to speak publicly about th[e] case."

On April 1, 2022, we denied both motions, and amici appealed to the Supreme Court requesting the same relief. On July 12, 2022, the Court issued an order granting the motion for leave to appeal and "summarily remand[ing] to the trial court to consider less restrictive measures." During the remand proceedings, conducted on November 7, 2022, and January 12, 2023, amici posited that their proposed redactions struck a suitable balance between speech, access, and safety, while defendant opined that the proposed redactions were

6

overly protective. On the other hand, plaintiff argued that there were no protective measures that would sufficiently ensure his safety.

On January 12, 2023, in an oral decision on the record, the trial judge ruled that "there [were] no less restrictive condition[s] that could be imposed that would overcome the general expectations of privacy afforded to victims of domestic violence" and that only "complete sealing of the records" was sufficient. In support, the judge first acknowledged that "[t]he records of domestic violence proceedings are rendered confidential pursuant to [N.J.S.A.] 2C:25-33(a)," but that the court was not "prohibit[ed]" from "making a case[-]by[-]case determination of the need for disclosure." Next, the judge applied the "analytical framework" outlined in Pepe v. Pepe, 258 N.J. Super. 157, 165 (Ch. Div. 1992), and Taub v. Cullen, 373 N.J. Super. 435, 439 (Ch. Div. 2004).

Applying those principles, the judge declared:

> The factors the [c]ourt must consider are as follows. First, will the release of the court documents be detrimental or potentially harmful to the victim? Second, will adverse publicity be a factor? Third, will access to the court records or in this case the brief on a case[-]by[-]case basis discourag[e] the victim from coming forward? And fourth, will this [c]ourt's decision deter others similarly situated from filing actions under the domestic violence act for fear of possible disclosure?

Regarding the first factor, the judge remarked that plaintiff's "name[ and] picture and defendant's self-proclaimed status as an [a]gunot[5] ha[ve] already infiltrated the community" and that "[a]ny additional release of information . . . has the potential for being detrimental to [plaintiff]." As to the second factor, the judge explained that because amici's briefs "improperly characterize[d] . . . defendant as the victim," if the briefs were unsealed, the "adverse publicity" would "confuse the public" and prevent "potential victims" from "seeking court assistance when social media is used to harass another."

Addressing factor three, the judge believed it was "foreseeable" that unsealing amici's briefs while the "parties [were] still in the midst of their divorce" would discourage plaintiff "from seeking help from the [c]ourt." With regard to factor four, the judge found that "amici's brief[s] would clearly discourage others from seeking assistance . . . for fear of being publicly humiliated or continually harassed by the court system."

Retreating from her earlier inclination to grant the application with restrictions, the judge explained that she did "not believe that the Supreme Court required" her to impose "less[] restrictive means," only to consider them. The

---

[5] "Agunah," pluralized "agunot," is an Orthodox term for a woman who wishes to leave a marriage but whose husband refuses to grant her a get. S.B.B., 476 N.J. Super. at 585, 591-92.

judge added that the revelation regarding plaintiff's submission of domestic violence restraining order applications in the public divorce docket did not change her decision. The judge issued a memorializing order the same day, and this appeal followed.

On appeal, amici argue the judge's ruling violates the First Amendment right to public access as well as State confidentiality laws. Amici also assert the judge's factual findings are limited and not supported by the record. Further, amici propose a multi-factor test to guide courts in similar situations. Defendant supports amici's appeal and agrees the First Amendment protects the parties' rights to share their briefs. However, defendant proposes several modifications to the multi-factor test propounded by amici and argues that all briefs, not just amici's, should be unsealed with less-stringent redactions than those proposed by amici.

In contrast, plaintiff contends the judge followed the law in denying the motion to unseal. Plaintiff posits that allowing amici to "sidestep the protections" afforded domestic violence victims "to pursue an agenda on behalf of women they view are oppressed is inappropriate and unwarranted." Because we agree the judge misapplied the law and made factual findings not supported by the record, we reverse.

II.

"The questions whether to seal or unseal documents are addressed to the trial court's discretion." Hammock by Hammock v. Hoffmann-LaRoche, 142 N.J. 356, 380 (1995); accord Matter of T.I.C.-C., 470 N.J. Super. 596, 606 (App. Div. 2022). "A court abuses its discretion when its 'decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."'" State v. Chavies, 247 N.J. 245, 257 (2021) (quoting State v. R.Y., 242 N.J. 48, 65 (2020)). "If the [trial court] misconceives or misapplies the law, [its] discretion lacks a foundation and becomes an arbitrary act." T.I.C.-C., 470 N.J. Super. at 606 (second alteration in original) (quoting In re Presentment of Bergen Cnty. Grand Jury, 193 N.J. Super. 2, 9 (App. Div. 1984)).

We defer to a trial court's factual findings so long as they "are 'supported by sufficient credible evidence in the record.'" State v. Mohammed, 226 N.J. 71, 88 (2016) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). On appeal, such findings will be overturned only if they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Griepenburg v. Twp. of Ocean, 220 N.J.

10

239, 254 (2015) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

Conversely, we review a trial court's legal interpretations de novo, according them no particular deference. In re Ridgefield Park Bd. of Educ., 244 N.J. 1, 17 (2020). "[I]n cases implicating the First Amendment, we must 'conduct an independent examination of the record as a whole, without deference to the trial court.'" S.B.B., 476 N.J. Super. at 594 (quoting Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 567 (1995)). "This obligation springs from the reality that the ultimate constitutional decision before the court is inextricably intertwined with the underlying facts, and so the court cannot render a decision on the constitutional question without examining the facts." Id. at 595.

In New Jersey, the public's right to access judicial proceedings has a venerable history, dating back to the seventeenth century and supported by constitution and common law alike. Hammock, 142 N.J. at 369-76. Similarly, the common law supports the public's right to view court documents. Id. at 370. "[O]ur Supreme Court has acknowledged that the First Amendment, the history of this State, and our court rules require that civil proceedings shall be open to the public unless 'an important state interest is at stake.'" Verni ex rel. Burstein

11                                                    A-1852-22

v. Lanzaro, 404 N.J. Super. 16, 22 (App. Div. 2008) (quoting N.J. Div. of Youth & Fam. Servs. v. J.B., 120 N.J. 112, 127 (1990)). The right to "speak, write and publish . . . on all subjects," N.J. Const. art. I, ¶ 6, is similarly revered, with speech on matters of public concern occupying the "highest rung of the hierarchy of First Amendment values" and enjoying "maximum protection." Rocci v. Ecole Secondaire Macdonald-Cartier, 165 N.J. 149, 156 (2000) (first quoting Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759 (1985); and then quoting Sisler v. Gannett Co., 104 N.J. 256, 266 (1986)).

New Jersey has also "evidenced a profound interest in combatting . . . domestic violence." Brennan v. Orban, 145 N.J. 282, 300 (1996). Indeed, in enacting the initial PDVA, the Legislature declared its "intent . . . to assure the victims of domestic violence the maximum protection from abuse the law can provide." State v. Kelly, 97 N.J. 178, 190 n.2 (1984) (quoting N.J.S.A. 2C:25-2 (1989)). "It is abundantly clear, therefore, that affording the victims of domestic violence the maximum protection the law has to offer is a matter of vital and significant public policy in New Jersey." In re E.F.G., 398 N.J. Super. 539, 546 (App. Div. 2008).

The value we place upon all these interests is reflected in our court rules. All proceedings are required to be conducted in "open court" and "no record of

12

any portion thereof shall be sealed . . . except for good cause shown." R. 1:2-1. Similarly, our court rules establish a "policy of open access to the records of the judiciary." R. 1:38-1. Such records include, but are not limited to, "pleadings, motions, briefs and their respective attachments, evidentiary exhibits," "any order, judgment, opinion, or decree," and "any official transcript or recording of a public proceeding." R. 1:38-2(a). Consistent with the judiciary's policy of openness, court records "within the custody and control of the judiciary are open for public inspection and copying," subject to certain "narrowly construed" exceptions. R. 1:38-1.

Two such exceptions are, "[d]omestic violence records and reports pursuant to N.J.S.A. 2C:25-33, except for parties and their counsel of record in the underlying domestic violence matter," and the "[n]ames and addresses of victims or alleged victims of domestic violence," which are excluded from public assess in Family Part proceedings. R. 1:38-3(d)(9) and (10). N.J.S.A. 2C:25-33(a), in turn, obliges the court to retain various confidential records related to domestic violence proceedings, including complaints filed in the Family Part alleging domestic violence. See N.J.S.A. 2C:25-28. The record-keeping requirement is narrow and specific and includes: the sexes of and relationship between the parties, the nature of the relief sought and imposed,

and, if no permanent restraints are entered, an explanation of why. N.J.S.A. 2C:25-33(a).

Beyond the records automatically kept confidential, "[i]nformation in a court record may be sealed by court order for good cause," that is, when "[d]isclosure will likely cause a clearly defined and serious injury to any person or entity" whose "interest in privacy substantially outweighs the presumption that all court . . . records are open for public inspection." R. 1:38-11. The proponent of sealing the records has the burden of demonstrating that such good cause exists. R. 1:38-11(a). Once a record has been sealed, "any person or entity" may move for it to be unsealed, whereupon "[t]he proponent for continued sealing shall bear the burden of proving by a preponderance of the evidence that good cause continues to exist for sealing the record." R. 1:38-12.

Because the speech and access rights at stake are of constitutional dimension, any restriction must be narrowly tailored to serve the government's countervailing interest in protecting another's confidentiality. Pepe, 258 N.J. Super. at 163-64; see also Globe Newspaper Co. v. Superior Ct., 457 U.S 596, 606-07 (1982) (holding the same, even where the information pertained to minors testifying as victims of sex crimes); J.B., 120 N.J. at 123-24 (holding the same in a case of emergency removal). Crucially, any rule authorizing the

sealing of court records cannot be mandatory, automatic, or categorical and still comport with the constitution. Globe Newspaper Co., 457 U.S at 607-08 ("But as compelling as [the countervailing] interest is, it does not justify a mandatory closure rule . . . ."); J.B., 120 N.J. at 124 ("A case-by-case determination of the need for closure is necessary in order to narrowly tailor the restriction to the governmental interest served."); Pepe, 258 N.J. Super. at 164-65 (finding the same under N.J.S.A. 2C:25-33).

As a corollary, any potential harm posed by unsealing identified by the court must be specific and concrete. "Broad allegations . . . unsubstantiated by specific examples or articulated reasoning[] are insufficient." Lederman v. Prudential Life Ins. Co. of Am., 385 N.J. Super. 307, 317 (App. Div. 2006) (citing Hammock, 142 N.J. at 381-82). Similarly, the court cannot summarily seal an entire record but must "'examine each document individually and make factual findings' with regard to why the interest in public access is outweighed by the interest in nondisclosure." Greebel v. Lensak, 467 N.J. Super. 251, 260 (App. Div. 2021) (quoting Keddie v. Rutgers, The State Univ., 148 N.J. 36, 54 (1997)). In the case of a motion to dissolve an existing seal, the court cannot merely refer to its prior findings, but must find, based on competent evidence,

that there is presently a need to continue the restraints. Lederman, 385 N.J. Super. at 317 (citing Hammock, 142 N.J. at 382).

In Pepe, 258 N.J. Super. at 165, the trial court developed a three-factor test intended for use "in determining whether or not a statutorily-imposed confidential record should be made public." The factors it listed were: (1) "Will the release of the court documents be detrimental or potentially harmful to the victim?" (2) "Will adverse publicity be a factor?" (3) "Will access to court records on a case-by-case basis discourage the victim from coming forward[?]" Ibid. In Taub, 373 N.J. Super. at 439, the trial court added a fourth factor, "whether [the trial court's] decision will deter others similarly situated from filing actions under the [PDVA] for fear of possible disclosure of their records in the future."

Apart from Pepe and Taub, both Chancery Division cases, no published case has applied this multi-factor test, nor cited it with approval. The few cases that have cited Pepe at all do so for general propositions. See S. Jersey Cath. Sch. Tchrs. Ass'n v. St. Teresa of the Infant Jesus Church Elementary Sch., 290 N.J. Super. 359, 398 (App. Div. 1996) (citing Pepe for the rule that the "[c]hancery court can narrowly tailor restrictions to the governmental interests served where [the] First Amendment is implicated"); In re Expungement of the

16

Crim. Rec. of M.D.Z., 286 N.J. Super. 82, 87 (App. Div. 1995) (discussing the Legislature's general approach to confidentiality of court records); D.C v. T.H., 269 N.J. Super. 458, 459 n.1 (App. Div. 1994) (explaining its use of parties' initials); Mann v. Mann, 270 N.J. Super. 269, 269 n.1 (App. Div. 1993) (explaining the use of fictitious names); Smith v. Smith, 379 N.J. Super. 447, 454 (Ch. Div. 2004) (citing Pepe to show that "there is authority to maintain confidentiality of the plaintiff's address in domestic violence cases"). Taub has never been cited as legal authority and only once, in an unrelated case, for its facts. See C.A. by Applegrad v. Bentolila, 219 N.J. 449, 461 n.8 (2014) (noting that the defendant in Taub, a former nurse who had confessed to killing numerous patients under his care, partly prompted the passage of the Patient Safety Act, N.J.S.A. 26:2H-12.23 to -12.25).

Citing Lederman, 385 N.J. Super. at 316; State v. Williams, 93 N.J. 39, 56 (1983); J.B., 120 N.J. at 119; and other foundational cases, amici argue that the judge erred by relying exclusively on the Pepe/Taub test, to the exclusion of the constitutional requirements outlined in First Amendment jurisprudence. Relatedly, amici argue that the judge abused her discretion because she failed to make constitutionally required findings of fact, while basing her implicit findings on "facts that were either unproven," "not in the record, or inadmissible

17

hearsay." In particular, amici point to the judge's finding that public disclosure of plaintiff's alleged refusal to provide the get would subject him to harm from the "Jewish community" as unsubstantiated in the record. Additionally, amici argue that any finding of danger based on the fact that amici's view of the case differs from the trial court's represents unconstitutional content-based restriction of government-critical speech, as outlined in Police Dep't of Chi. v. Mosley, 408 U.S. 92, 95-96 (1972); Mazdabrook Commons Homeowners' Ass'n v. Khan, 210 N.J. 482, 499 (2012); and numerous other cases.

Defendant echoes amici's arguments that the constitution requires specific, well-grounded findings that the judge failed to make. Defendant emphasizes that because this case does not involve a third party seeking to access the court filings of others but rather the litigants themselves, the right to free speech looms particularly large. She contends that this is particularly true given the nature of the speech, which she characterizes as ideological speech touching on matters of religion, family, and government, and the nature of the restraints, which she describes as broad prior restraints issued automatically.

On the other hand, plaintiff argues that the judge correctly applied Pepe and Taub and "issued a ruling on the record specifically outlining the law and facts" necessary. He describes the danger of unsealing the briefs as essentially

coterminous with the harm alleged in the restraining order proceedings, claiming that defendant and amici "will simply continue to spread the information which led to the [FRO]." He contends that N.J.S.A. 2C:25-17 and -33, requiring confidentiality of domestic violence records, trump amici and defendant's constitutional claims.

We agree that the judge erred in confining her analysis to the four-factor test outlined in Pepe, 258 N.J. Super. at 165, and Taub, 373 N.J. Super. at 439-41. Pepe and Taub, decided in 1992 and 2004, respectively, predate the adoption of the modern rule governing access to court records. They also predate cases addressing the legal requirements and constitutional limitations of sealing court records, such as Lederman, 385 N.J. Super. 307; Verni, 404 N.J. Super. 16; and Greebel, 467 N.J. Super. 251. Indeed, as we stated in Greebel, the presumption of public access to documents and materials filed in a civil action "may be rebutted by showing '[d]isclosure will likely cause a clearly defined and serious injury to any person' and '[t]he person's . . . interest in privacy substantially outweighs' the need for access." Id. at 259-60 (alterations in original) (quoting R. 1:38-11).

Further, mindful that "[t]he party or person seeking to overcome the presumption in favor of public access bears the burden to convince a court that

the interest in secrecy outweighs this presumption," <u>Verni</u>, 404 N.J. Super. at 22, "[t]he court must state with particularity the facts that 'currently persuade the court to seal the document[s],'" <u>Greebel</u>, 467 N.J. Super. at 260 (second alteration in original) (quoting <u>Hammock</u>, 142 N.J. at 382), and "[t]he court must 'examine each document individually and make factual findings' with regard to why the interest in public access is outweighed by the interest in nondisclosure," <u>ibid.</u> (quoting <u>Keddie</u>, 148 N.J. at 54).

Here, to the extent the judge confined her inquiry to application of the four-factor test outlined in <u>Pepe</u> and <u>Taub</u>, she failed to place the burden of proof on plaintiff and overlooked requirements like specificity of harm resulting from disclosure, an individualized examination of documents to justify nondisclosure, an up-to-date assessment of current facts dictating sealing, and narrow tailoring. As such, her ruling did not live up to well-delineated constitutional standards. <u>J.B.</u>, 120 N.J. at 124; <u>Greebel</u>, 467 N.J. Super. at 260; <u>Verni</u>, 404 N.J. Super. at 21, 23-25; <u>Lederman</u>, 385 N.J. Super. at 317.

At a more basic level, each of the four factors delineated in <u>Pepe</u> and <u>Taub</u> are oriented toward the potential risks implicated by unsealing; none of the factors addresses the countervailing interests served by unsealing. <u>Taub</u>, 373 N.J. Super. at 439-41. Yet, they are some of our most cherished rights. We

maintain open courts to "promote[] fairness and enhance[] public confidence in judicial procedures." J.B., 120 N.J. at 119 (citing Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 564-73 (1980)). We safeguard the rights of the press "not for the benefit of the press so much as for the benefit of all of us," to "assure[] the maintenance of our political system and an open society." Time, Inc. v. Hill, 385 U.S. 374, 389 (1967).

Perhaps most crucially, "[o]ne of the core purposes of the First Amendment is to protect speech on matters of public interest, including speech that the government finds offensive." Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist., 201 N.J. 544, 568-69 (2010) (citing Mosley, 408 U.S. at 96). It is out of respect for all these rights that there is a strong presumption of access to court records and that overcoming that presumption requires a careful balancing of the factors favoring secrecy against those favoring access. Lederman, 385 N.J. Super. at 316-17.

This case-by-case balancing test is constitutionally required, notwithstanding any law that would otherwise compel exclusion. See, e.g., Globe Newspaper Co., 457 U.S. at 607-11 (holding that a law mandatorily closing the courtroom while minors testified as victims in sex crime trials violated the constitution); Pepe, 258 N.J. Super. at 164-66 (construing N.J.S.A.

2C:25-33 to permit case-by-case balancing so as to avoid unconstitutionality). This is so because, while the Legislature—or the court for that matter—can identify an interest that supports secrecy, it cannot extinguish competing rights enshrined in the Constitution.  See, e.g., Globe Newspaper Co., 457 U.S. at 607; J.B., 120 N.J. at 124, 127; see also Counselman v. Hitchcock, 142 U.S. 547, 565 (1892) ("Legislation cannot detract from the privilege afforded by the [C]onstitution."), overruled on other grounds by Kastigar v. United States, 406 U.S. 441 (1972).

Here, although the judge acknowledged amici's "strong interest in publicly discussing their briefs," she never recognized that the constitutionally derived rights to speech and court access were valid interests that she was required to consider.  J.B., 120 N.J. at 127 ("[T]he court must balance the public's right of access . . . against the State's interest" in protecting case participants' privacy (emphasis added)); Lederman, 385 N.J. Super. at 316-17 (prescribing a "flexible balancing process," weighing the interest in public access against the interest in secrecy (quoting Hammock, 142 N.J. at 381)).  Instead, the judge considered what she identified as "the general expectations of privacy afforded to victims of domestic violence" and found that no proposed redactions could "overcome" that interest.  In doing so, the judge gave controlling weight to plaintiff's interest

and no weight to the constitutionally-derived interests of amici and defendant or to the rights of the public, contrary to settled authority.

Indeed, even Taub, 373 N.J. Super. at 441, acknowledged that the burden was on the party seeking to maintain a seal to "demonstrate that there [was] a compelling need" to do so and "no adequate alternatives." By failing to consider amici and defendant's constitutionally-protected interests, and by failing to conduct the proper balancing test with the appropriately assigned burden, the judge applied the incorrect legal standard, rendering her sealing decision "an arbitrary act." T.I.C.-C., 470 N.J. Super. at 606 (quoting Bergen Cnty. Grand Jury, 193 N.J. Super. at 9).

Additionally, the judge's factual finding that publication of what she referred to as the false "Agunot scenario" into "the community" would put plaintiff "again . . . in harm's away" was a recapitulation of her findings in the FRO litigation that plaintiff was the victim of unlawful harassment by defendant and the Jewish community was likely to perpetrate violence on plaintiff as an accused get refuser. However, those findings were completely vitiated by our holding in S.B.B., where we determined that such findings of fact were "not supported by the record." Id. at 607-08.

To be clear, we do not fault the judge on this score because the judge issued her opinion maintaining the seal in January 2023, eight months before S.B.B. was decided. Nonetheless, our holding that a given fact is "lacking support in the record . . . is binding." State v. Bellamy, 468 N.J. Super. 29, 40 (App. Div. 2021) (citing Tomaino v. Burman, 364 N.J. Super. 224, 234 (App. Div. 2003)). Because key findings underpinning the judge's ruling are "manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence," Griepenburg, 220 N.J. at 254 (quoting Rova Farms, 65 N.J. at 484), the opinion rests "on an impermissible basis," Chavies, 247 N.J. at 257 (quoting R.Y., 242 N.J. at 65), resulting in a mistaken exercise of discretion that mandates reversal. T.I.C.-C., 470 N.J. Super. at 606.

Even if there had been a valid showing of harm,[6] the judge failed to examine the documents at issue with any level of specificity and to make specific

---

[6] The judge also referred to the prospect of plaintiff being "publicly humiliated" and the "general expectation of privacy" he was afforded to support her finding of the requisite harm. However, we have held that a "personal interest in privacy and freedom from annoyance and harassment, while important to the litigant, will not outweigh the presumption of open judicial proceedings." Verni, 404 N.J. Super. at 24. Moreover, the prospect of "embarrassment" does not generally justify sealing records. Lederman, 385 N.J. Super. at 320 ("If embarrassment were the yardstick, sealing court records would be the rule, not the exception."). Thus, these references to potential harm are unavailing both because they are general and speculative in nature and because they are of the sort that we have specifically found insufficient to justify sealing.

findings about the unsuitability of proposed alternatives.  Greebel, 467 N.J. Super. at 260 (mandating individualized review); Taub, 373 N.J. Super. at 441 (explaining that the burden is on the party advocating a seal to show "that there are no adequate alternatives").  The judge did not discuss the details of the redactions proposed by each party or explain why they would be unsuitable.  Instead, she found "that even with the redactions as proposed by plaintiff . . . there [were] no less restrictive condition[s] that could be imposed that would overcome the general expectations of privacy afforded to victims of domestic violence, but for the complete sealing of the records."  Even if true, the judge's failure to explain her conclusion evidences a mistaken exercise of discretion. Chavies, 247 N.J. at 257 (holding that a decision made "without a rational explanation" constitutes an abuse of discretion (quoting R.Y., 242 N.J. at 65)).

The notion that there are no redactions that could render amici's briefs safe for public consumption strains credulity, especially since, consonant with their role as amici, the briefs are more geared toward the broader social and legal context of the case than the individual litigants.  Indeed, ACLU amici's brief often continues for pages at a time without mentioning the parties at all.  ORA amici's brief is almost purely informational, mentioning the specifics of the case only in the last two pages of its "legal argument" section.  The judge's

unexplained holding that these briefs could not be made generic enough for distribution—even if correct about the risks involved—is so inconsistent with the record that it "offend[s] the interests of justice," providing an additional ground for reversal. Griepenburg, 220 N.J. at 254 (quoting Rova Farms, 220 N.J. at 484).

Turning to the remedy, we grant amici's request to unseal the briefs. We also direct that the parties' briefs be unsealed in the same manner as amici's.[7] The public interest is better served by complete disclosure than selective disclosure. In arriving at this outcome, we weigh the interests served by disclosure against the interests served by secrecy, and conclude that in the circumstances of this case, the available evidence simply does not demonstrate an interest in secrecy that outweighs the combined interests in open access and free speech. Lederman, 385 N.J. Super. at 316-17. This balancing test incorporates both generally applicable interests—speech and public access on the one hand and victims' privacy on the other—and case-specific factors which diminish or enhance those interests. Ibid.; see also J.B., 120 N.J. at 127; Taub, 373 N.J. Super. at 439-41.

---

[7] Defendant in fact urges that "the parties' briefs," not merely her own, be unsealed. Plaintiff does not take a position on whether his brief should remain sealed in the event that the other briefs are unsealed.

Critically, given our opinion in S.B.B., the information contained in the briefs is duplicative of information already available to the public and thus less likely to pose any realistic risk of harm.  Taub, 373 N.J. Super. at 441.  The public interest in protecting the privacy of domestic violence victims, while no doubt valid, holds little weight in this case where we have determined that plaintiff was not the victim of domestic violence but the subject of lawful speech.  S.B.B., 476 N.J. Super. at 608-09.  As for the valid concern identified by the judge that unsealing might discourage future victims of domestic violence from seeking help, Taub, 373 N.J. Super. at 440-41, such a blanket concern cannot carry the day.  If it could, the mandate to analyze sealing requests on a case-by-case basis would vanish and be replaced by an automatic process long recognized as unconstitutional.  Globe Newspaper Co., 457 U.S. at 606-08.

Beyond the general public interest in open court records, Rule 1:38-1, and the "[p]ublic confidence in the judiciary" that it promotes, J.B., 120 N.J. at 122, defendant and amici identify a number of specific interests in disseminating and discussing their briefs.  ACLU amici explain their desire to discuss "the ramifications of a trial court's order on the ability of people allegedly experiencing abuse to use social media to ask for help to end their plights."  They emphasize that the underlying case concerns "the constitutional free speech

rights of a woman . . . to use social media to speak about her inability to obtain a religious divorce and ask her religious community for help ending an allegedly untenable situation," the court's finding that this "peaceful online speech constituted harassment," and the ensuing imposition of sweeping restrictions on her speech.[8] Their brief in the underlying case bears out their claims.

ORA amici's concerns are similarly socially inflected; their brief in the underlying domestic violence case discusses get-withholding as a unique manifestation of abuse and explains the crucial role that speech and community have in resisting that abuse. Emphasizing the magnitude of the issue, ORA amici report that although the problem of get-refusal is hard to quantify, "[s]ome estimate that there are 150,000 agunot in New York alone." Defendant identifies similar concerns as amici, although understandably is more focused on her own experience than a global context, and adds a discussion of the untenable dynamic created where plaintiff was free to speak but she was not.

The discussion in which the litigants wish to engage implicates issues of gender, religion, speech, media, culture, community, and the power of the state.

---

[8] In the FRO litigation, after granting plaintiff the FRO, the judge "specifically ordered defendant to 'remove any and all posts from all social media platforms requesting the "get"' and 'cease and desist . . . creating and posting on all social media platforms.'" S.B.B., 476 N.J. Super. at 589 (omission in original).

These are precisely the kinds of topics in which the public has the greatest interest and, in turn, whose suppression our Constitution will most stoutly resist. Besler, 201 N.J. at 568-69; Rocci, 165 N.J. at 156. In sum, plaintiff has identified little if any legally cognizable interest in secrecy, whereas the remaining litigants have identified a particularly strong interest in openness. Under these circumstances, it cannot be said that the record demonstrates an interest in secrecy so compelling that it eclipses competing constitutional rights. Globe Newspaper Co., 457 U.S. at 606-07.

As for redactions, both defendant and amici presume that some redaction is appropriate, but disagree on the extent. Plaintiff has taken no position. Amici propose redaction of party names to first initials instead of complete initials, redaction of the docket number, and redaction of quotations from evidentiary portions of the transcript in the FRO litigation. Amici predicted—correctly— that these measures would be more protective than those applied by this court in its eventual published opinion.

Conversely, defendant asserts there is no legal basis to reduce the parties' names to first initials instead of complete initials, as this court's opinion would ultimately do. Defendant warns that adopting one convention for briefs and another for court documents in the same case could be confusing. Citing T.S.R.

29

v. J.C., 288 N.J. Super. 48, 60-61 (App. Div. 1996), she likewise emphasizes that both shortened initials and a redacted docket number would increase the air of secrecy surrounding the proceedings and, in equal measure, decrease the public confidence in the proceedings. Citing Pepe, 258 N.J. Super. at 164-65, she asserts that there is "no legal basis to redact quotations from the transcript[s]" because those proceedings "were open to the public." Defendant contends that only the parties' full names and identifying information should be redacted.

In light of this court's opinion—which included full initials, docket numbers, and transcript quotations—we believe that the additional redactions proposed by amici are unnecessary. Indeed, they would be ineffectual and would impair the public's ability to access and navigate the information presented. Accordingly, we agree with defendant that only the parties' full names and identifying information need be redacted from the unsealed briefs, consistent with our opinion in S.B.B.

Separately, defendant moves to unseal not only the litigants' briefs, but the records in both the underlying domestic violence case and amici's appeal from the remand proceedings. She argues the records should be unsealed without applying any protective measures. She contends that the method and

scope of the initial sealing render them unconstitutional in the first instance—especially to the extent that they operated as prior restraints on speech—because they were imposed automatically, without the requisite motions, opportunity to be heard, or findings.

Defendant correctly points out that this court will automatically seal any appeal arising from the domestic violence or FV docket. She also asserts that the initial protective order in the trial court was similarly automatically generated "in response to a routine transcript request[] and without motion practice." These practices apparently stem from an Administrative Directive promulgated in 2011 in response to the adoption of the modern Rule 1:38. See Admin. Off. of the Cts., Admin. Directive #03-11, Procedures for Providing Public Access to Court Records and Administrative Records Pursuant to Rule 1:38 attach. C3, at 17 (July 12, 2011); see also S.M. v. K.M., 433 N.J. Super. 552, 554 n.2 (App. Div. 2013) ("We note that an administrative directive has the force of law.").

The Directive lists the categories of records in the Family Part that are excluded from public access and provides that they are "confidential and are not available to the public." Admin. Directive #03-11, attach. C-3 at 17-18 (emphasis omitted). Notably, the Directive does not include a procedure by

which litigants may request that such documents be unsealed and made available to the public, thus creating an automatic and mandatory sealing of designated records.

However, the policy of sealing entire FV dockets goes beyond the authority provided by the Directive, which, like Rule 1:38-3 itself, covers only a narrow subset of such records: the names and addresses of victims and alleged victims of domestic violence and internally-generated court records documenting the sex of the parties, their relationship, the relief sought, and the relief granted, or not. Admin. Directive #03-11, attach. C-3 at 17 (citing N.J.S.A. 2C:25-33). Any other records are not included and, indeed, the Directive specifies that it does not apply to transcripts of proceedings. Id. at 3. Thus, automatically sealing an entire case appears to violate the Directive.

Although these automatic seals would seem to be in tension with the constitutional principles addressed in Globe Newspaper Co., 457 U.S. at 607-08, and J.B., 120 N.J. at 124, we decline to reach the question of whether the courts' practice of automatically sealing certain cases is constitutional.[9] "[T]he

---

[9] We also reject defendant's assertion that the rules applicable in domestic violence cases do not apply to this case merely because we overturned the finding of domestic violence in S.B.B. Rule 1:38-3(d)(9) excludes from public access "[d]omestic violence records and reports pursuant to N.J.S.A. 2C:25-33."

principle of 'constitutional avoidance' favors leaving constitutional issues that need not be decided for another day." In re Wheeler, 433 N.J. Super. 560, 596 (App. Div. 2013) (quoting United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011), abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022)). Defendant did not appeal from the initial protective order or the sealing of the appellate docket, both in 2021, nor from the denial of her first motion to unseal the record in 2022.[10] Because defendant declined to appeal those decisions, any objection to the procedure used therein is waived. Cf. State ex rel. Comm'r of Transp. v. Marlton Plaza Assocs., L.P., 426 N.J. Super. 337, 365 (App. Div. 2012) (holding that defendants' attempt to

---

The statute, in turn, includes records generated in "a civil action in which no permanent restraints are entered," requiring documentation of the "reasons for the disposition." N.J.S.A. 2C:25-33(a)(7). Thus, by its plain language, the statute applies regardless of the case's disposition. Equally unavailing is defendant's contention that our holding in S.B.B., declaring that plaintiff was not a victim of domestic violence, id. at 596, 608-09, precludes his claim for confidentiality under the rules. Indeed, our holding in S.B.B. does not vitiate plaintiff's status as an "alleged victim" expressly encompassed in Rule 1:38-3(d)(10)'s sealing requirement. See R. 1:38-3(d) (providing for the names and addresses of alleged victims of domestic violence to be sealed).

[10] During the appeal from the FRO, on February 22, 2022, defendant moved before this court to unseal the record, which motion was denied. On October 2, 2023, defendant moved again for the same relief in amici's appeal from the remand proceedings, which we reserved for consideration alongside amici's appeal.

seek "so-called severance damages" stemming from an access modification to which they consented could not be considered in a condemnation trial, as defendants were limited to the reliefs set forth in administrative procedures and had not sought further review with the agency nor appealed its decision).

Instead, this case can be resolved on other grounds. The principles discussed in determining whether the briefs should be unsealed apply with equal force to the record overall. As a result, we conclude that the same result should obtain. Rule 1:38-3(d)(10) applies to the names and addresses of victims and alleged victims. Rule 1:38-3(d)(9) and N.J.S.A. 2C:25-33(a) apply to internally-generated court records documenting the sex of the parties, their relationship, the relief sought, the relief granted, and, if "no permanent restraints are entered . . . the reason" why. Anything beyond these limited categories must either fall in another express exception or satisfy the generally-applicable good cause standard. R. 1:38-11.

The fact that plaintiff made information about the domestic violence case a part of the open record in the parties' divorce derogates plaintiff's privacy interest and further attenuates the possibility that unsealing the court files could cause harm. Doe v. Poritz, 142 N.J. 1, 80 (1995) (citing Katz v. United States, 389 U.S. 347, 351 (1967)), overruled on other grounds by Riley v. N.J. State

Parole Bd., 219 N.J. 270 (1995); Taub, 373 N.J. Super. at 441.  Although the narrow group of records covered by Rule 1:38-3(d) would not become public by their inclusion in the divorce case, see R. 1:38-3(a) (providing that "[r]ecords required to be kept confidential by statute, rule, or prior case law" "remain confidential even when attached to a non-confidential document"), any other record so filed would, including copies of the restraining orders, police reports, and transcripts of the proceedings.  Since the facts of this case have already been discussed, albeit without the parties' full names attached, unsealing the record is less likely to inure to plaintiff's detriment, particularly if names are similarly redacted.

Stated differently, defendant's case for unsealing the record is at least as strong as the case for unsealing the briefs.  However, that determination does not dispose of the matter entirely.  Because we are not positioned to examine each document in the various records individually, as required under Greebel, 467 N.J. Super. at 260, we order a limited remand to allow the parties to identify any specific documents or pieces of information that should remain confidential, despite the balance of the case file being unsealed, to allow the parties to make the affirmative case for any specific protective measures they believe are warranted, and to allow the judge to individually examine the documents called

into question. Such preliminary fact-finding is best conducted in the first instance by the trial court. Rosenberg v. State Dep't of L. and Pub. Safety, 396 N.J. Super. 565, 580 (App. Div. 2007) (observing, in the common law right to know context, the trial court was better positioned to "examine each document individually" and weigh competing interests in the first instance (quoting Keddie, 148 N.J. at 54)); cf. Tomaino, 364 N.J. Super. at 234-35 (holding the same in the remittitur context).

We further direct that the remand proceedings be conducted by a different judge. When a judge has previously "made credibility findings" or "may be perceived to be committed to his or her original fact-findings," it is "appropriate for us to assign the case to a different trial judge." In re D.L.B., 468 N.J. Super. 397, 420-21 (App. Div. 2021) (first citing R.L. v. Voytac, 199 N.J. 285, 306 (2009); and then citing Penbara v. Straczynski, 347 N.J. Super. 155, 163 (App. Div. 2002)). Likewise, reassignment is called for where a judge adopts conclusions that are "insufficiently supported by the evidence in the record" and "cast doubt upon the realistic possibility of an impartial hearing before the same judge on remand." P.T. v. M.S., 325 N.J. Super. 193, 221 (App. Div. 1999). Because the original judge has made credibility findings and factual conclusions insufficiently supported by the record, the remand must be conducted by a new

judge in order to ensure "the appearance as well as the reality of an impartial hearing." <u>Ibid.</u>

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1852-22